FILED
U.S. DISTRICT COURT
BRUNSWICK DIV.
2020 JAN 24 PM 2: 44
CLERK _C. Robinson_
SO. DIST. OF GA.

# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

WARREN KING,

    Petitioner,

    v.

WARDEN,
Georgia Diagnostic Prison,

    Respondent.

CV 2:12-119

## ORDER

Before the Court is Petitioner Warren King's Amended Petition for Writ of Habeas Corpus, dkt. no. 29. For the reasons provided below, King's Petition is **DENIED**.

## BACKGROUND

**The Underlying Crime, Conviction, and Direct Appeal[1]**

> Warren King was convicted of malice murder, armed robbery, burglary, aggravated assault, false imprisonment, and possession of a firearm during the commission of a felony. The jury fixed his sentence for the murder at death after finding the following statutory aggravating circumstances to exist: the murder was committed during the commission of the capital felony of armed robbery and during the

---

[1] The Court presumes that the Georgia Supreme Court's factual findings are correct unless they are rebutted by clear and convincing evidence. See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct. The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence.").

AO 72A
(Rev. 8/82)

commission of a burglary; the murder was committed for the purpose of receiving money or other things of monetary value; and the murder was committed by King as the agent of another, Walter Smith. O.C.G.A § 17-10-30(b)(2), (4), (6). . . .

A surveillance camera videotape and witness testimony identifying the persons recorded on the videotape, showed that on the night of September 13, 1994, King and his cousin, Walter Smith, visited a convenience store in Surrency, Georgia, at approximately 10:45 p.m. Smith testified that he found King later that night and that King suggested they rob the convenience store. Smith had previously obtained a .380 caliber handgun from a relative's home, and, according to Smith's testimony, King took the handgun from the seat of Smith's vehicle and carried it with him as the two parked and walked to the convenience store.

Shortly after midnight on September 14, 2000, Karen Crosby, an employee of the convenience store, set the store's alarm, locked the door, and walked toward her automobile. King and Smith confronted her in the store's parking lot, and King ordered her at gunpoint to "give it up." Crosby recognized King and spoke to him by name. Crosby then threw her keys to Smith, who entered the convenience store as King continued to hold Crosby at gunpoint. The store's surveillance camera recorded Smith entering the store, the sounding of the store's alarm, Smith running from the store, and, approximately twenty-four seconds later, the sound of two gunshots. King testified, during the sentencing phase, that Smith yelled at him repeatedly to shoot Crosby but that he, instead, handed the gun to Smith. However, Smith testified that, as he was running from the store, he heard the two shots, turned, and saw Crosby falling to the ground. Smith also testified that, as he and King were fleeing the scene, King exclaimed, "I hope I killed the bitch."

King v. State, 539 S.E.2d 783, 788-89 (Ga. 2000).

The crimes occurred shortly after midnight on September 14, 1994. King was indicted on October 4, 1994, by an Appling County grand jury for malice murder, armed robbery, burglary, two counts of felony murder,

aggravated assault, false imprisonment, and possession of a firearm during the commission of a felony. The State filed written notice of its intent to seek the death penalty on January 6, 1995. King's trial began on September 14, 1998, and the jury found him guilty of malice murder, armed robbery, burglary, aggravated assault, false imprisonment, and possession of a firearm during the commission of the felony of false imprisonment on September 24, 1998. On September 25, 1998, the jury fixed the sentence for the murder at death. Also on September 25, 1998, the trial court ordered the death sentence for the murder and the following consecutive prison terms for King's other crimes: life imprisonment for armed robbery; twenty years for burglary; twenty years for aggravated assault; ten years for false imprisonment; and five years for possession of a firearm during the commission of a felony. King filed a motion for a new trial on October 28, 1998, and, in an order filed on November 19, 1998, the trial court directed that the motion be deemed as timely filed. King amended his motion for new trial on November 24, 1999, and the trial court denied the amended motion in an order filed on February 7, 2000. King filed his notice of appeal on February 28, 2000. His appeal was docketed in [the Supreme Court of Georgia] on March 29, 2000, and orally argued on July 17, 2000.

Id. at 788 n.1.

On November 30, 2000, the Supreme Court of Georgia affirmed the trial court's decision. Id. at 802. King's subsequent petition to the United States Supreme Court for a writ of certiorari from the Supreme Court of Georgia's order was also denied. King v. Georgia, 536 U.S. 957 (2002).

**Habeas Proceedings**

On October 28, 2002, King filed his state habeas petition in the Superior Court of Butts County (the "state habeas court"), dkt. no. 25-3 at 2; he subsequently filed an amended petition with that same court, dkt. no. 19-35. From December 15, 2008 to December 17, 2008, an evidentiary hearing was held. Dkt. No. 19-37 at 1. On April 20, 2010, the state habeas court denied King's first amended petition. Dkt. No. 25-3 at 73. On July 22, 2010, King applied to the Georgia Supreme Court for a certificate of probable cause to appeal the state habeas court's order. Dkt. No. 25-5. On November 7, 2011, the Georgia Supreme Court summarily denied King's application. Dkt. No. 25-10. King again petitioned the United States Supreme Court for a writ of certiorari, dkt. no. 25-11, and King's petition was again denied by that Court, King v. Humphrey, 567 U.S. 907 (2012).

After filing this petition in this Court in 2012, dkt. no. 1, King filed an amended petition on May 2, 2013, dkt. no. 29. King filed his initial brief in support of his amended petition on November 13, 2018, dkt. no. 62; he then filed a corrected brief on November 19, 2018, dkt. no. 65. The State filed its response on April 3, 2019, dkt. no. 72. King has since filed his reply, dkt. no. 78, and a supplemental brief, dkt. no. 79. King's amended petition is fully briefed and ripe for review.

AO 72A
(Rev. 8/82)

## **DISCUSSION**

King's Amended Petition sets forth nine broad claims (some of which contain numerous sub-claims), but in his brief in support of his amended petition, King only presents arguments on four of his nine claims. King has explicitly withdrawn three of his claims: Claims Three, Six, and Nine. See Dkt. No. 40. Further, King did not provide any argument on Claims Seven or Eight in his briefs in support of his amended petition. Thus, King cannot satisfy his burden on these claims. The remaining claims, then, are Claims One, Two, Four, and Five, and they are addressed in turn.

## I. Ineffective Assistance of Counsel Claims (Claim One)

As an initial matter, where the state's highest court issues an unexplained, summary decision on appeal of a reasoned lower court decision, "the federal court should 'look through' the unexplained decision to the last related state-court decision that does provide a relevant rationale." Wilson v. Sellers, 138 S. Ct. 1188, 1192 (2018). "It should then presume that the unexplained decision adopted the same reasoning." Id. at 1192. Here, King applied to the Georgia Supreme Court for a Certificate of Probable Cause to Appeal after the state habeas court denied his First Amended Petition for Writ of Habeas Corpus. See Dkt. Nos. 25-4; 25-5. The Georgia Supreme Court then summarily denied King's application. Dkt. No. 25-10. The Court thus focuses on the

AO 72A
(Rev. 8/82)

reasonableness of the state habeas court's decision, even though it was not the last state-court "adjudicat[ion] on the merits," 28 U.S.C. § 2254(d). Finally, the Court "presume[s]" that the Georgia Supreme Court's summary denial "adopted the superior court's reasoning unless the state 'rebut[s] the presumption by showing that the [summary denial] relied or most likely did rely on different grounds." Raulerson v. Warden, No. 14-14038, 2019 WL 2710051, at *5 (11th Cir. June 28, 2019) (quoting Wilson, 138 S. Ct. at 1192).

## A. Standard of Review

"The Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) requires a prisoner who challenges (in a federal habeas court) a matter 'adjudicated on the merits in State court' to show that the relevant state-court 'decision' (1) 'was contrary to, or involved an unreasonable application of, clearly established Federal law,' or (2) 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Wilson, 138 S. Ct. at 1191 (quoting 28 U.S.C. § 2254(d)). Here, King's claims are controlled by AEDPA. When determining whether the state habeas court committed either of these two errors or both, the Court must "'train its attention on the particular reasons—both legal and factual—why [the state habeas court] rejected [King's] federal claims,'" id. at 1191-92

(quoting Hittson v. Chatman, 135 S. Ct. 2126, 2126 (2015) (Ginsburg, J., concurring in denial of certiorari)), and "give appropriate deference to [the state habeas court's] decision," id. at 1192. "This narrow evaluation is highly deferential, for a state court's determination that a claim lacks merit precludes federal habeas relief so long as fairminded jurists could disagree on the correctness of the state court's decision." Wilson v. Warden, Ga. Diagnostic Prison, 898 F.3d 1314, 1321 (11th Cir. 2018) (citation and quotation marks omitted). Indeed, the Court must not ask "whether a federal court believes the state court's determination was correct but whether that determination was unreasonable—a substantially higher threshold." Id. (citation and quotation marks omitted). In other words, the Court must "focus not merely on the bottom line ruling of the decision but on the reasons, if any, given for it." Meders v. Warden, Ga. Diagnostic Prison, 911 F.3d 1335, 1349 (11th Cir. 2019). "However, where the petitioner makes the required § 2254(d) showing as to a state court decision, we owe no AEDPA deference to that decision and instead review the claim de novo." Johnson v. Upton, 615 F.3d 1318, 1329–30 (11th Cir. 2010). Because the Georgia Supreme Court was the last court to decide King's Batson claims in a "decision on the merits in a reasoned opinion," the Court "simply reviews the specific reasons given by [the Georgia Supreme Court] and defers

AO 72A
(Rev. 8/82)

to those reasons if they are reasonable." Wilson, 138 S. Ct. at 1192.

"A state court's decision is contrary to federal law if it contradicts the United States Supreme Court on a settled question of law or holds differently than did that Court on a set of materially indistinguishable facts—in short, it is a decision substantially different from the Supreme Court's relevant precedent." Cummings v. Sec'y for Dep't of Corr., 588 F.3d 1331, 1355 (11th Cir. 2009) (internal quotation marks and citation omitted). "A state court's decision involves an unreasonable application of federal law if it identifies the correct governing legal principle as articulated by the United States Supreme Court, but unreasonably applies that principle to the facts of the petitioner's case, unreasonably extends the principle to a new context where it should not apply, or unreasonably refuses to extend it to a new context where it should apply." Id. (internal quotation marks and citations omitted).

As to factual issues, AEDPA requires the Court to "'presume[ ]' that the state court's findings of fact are correct." Whatley v. Warden, Ga. Diagnostic & Classification Ctr., No. 13-12034, 2019 WL 2536841, at *19 (11th Cir. June 20, 2019) (quoting 28 U.S.C. § 2254(e)(1)) (alteration in original). King's challenges to a decision of the state habeas court that are based

on factual findings "must overcome two hurdles": (1) King must show by "'clear and convincing evidence'" that a particular factual finding was not correct; and (2) King "must overcome the deference that we give to the state court's legal decision under § 2254(d)." Id. (quoting 28 U.S.C. § 2254(e)(1)).

Turning to the elements of an ineffective assistance of counsel claim, King must establish that his trial counsels' "'performance was deficient, and that the deficiency prejudiced [his] defense.'" Wilson v. Warden, 898 F.3d at 1322 (alteration in original) (quoting Wiggins v. Smith, 539 U.S. 510, 521 (2003)). To satisfy the first prong, the deficient performance prong, "a defendant must show that his counsel's conduct fell 'below an objective standard of reasonableness' in light of 'prevailing professional norms' at the time the representation took place." Johnson, 615 F.3d at 1330 (quoting Bobby v. Van Hook, 558 U.S. 4, 7 (2009)). Further, "[j]udicial review of a defense attorney's [performance] is [ ] highly deferential-and doubly deferential when it is conducted through the lens of federal habeas." Yarborough v. Gentry, 540 U.S. 1, 6 (2003). "This is because, as the Supreme Court told us in Strickland, counsel's performance is itself due a base level of deference: 'Judicial scrutiny of counsel's performance must be highly deferential.' When we layer the 'deferential lens of § 2254(d)' atop that first level of deference, the end result is 'doubly deferential' review of

counsel's performance." Evans v. Sec'y, Dep't of Corr., 703 F.3d 1316, 1333 (11th Cir. 2013) (quoting Strickland v. Washington, 466 U.S. 668, 689 (1984); Knowles v. Mirzayance, 556 U.S. 111, 121 n.2 (2009)).

On the other hand, with the prejudice prong, there is (other than AEDPA deference) no underlying deference and the "question is, in the end, a legal one." Id. at 1334. A defendant has been prejudiced when "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Id. "This does not require a showing that counsel's actions more likely than not altered the outcome, but the difference between Strickland's prejudice standard and a more-probable-than-not standard is slight and matters only in the rarest case. Harrington v. Richter, 562 U.S. 86, 111-12 (2011) (internal quotation marks and citation omitted). The likelihood of a different result must be substantial, not just conceivable." Id. at 112.

### 1. Whether the State Habeas Court Unreasonably Applied Federal Law by Ignoring Jackson's Ineffectiveness in Another Case

King argues that the Court must review his Strickland claims de novo because the state habeas court unreasonably applied clearly

established federal law by finding that another case in which King's lead trial counsel, G. Terry Jackson, was found to have rendered deficient performance had "no bearing on the [state habeas court's] determination of performance" in King's case. Dkt. No. 25-3 at 8 n.1. The other case is Terry v. Jenkins, 627 S.E.2d 7 (Ga. 2006). In Jenkins, the petitioner had been convicted in September 1995 of malice murder, id. at 8, which he committed in January 1993, Jenkins v. State, 498 S.E.2d 502, 507 (Ga. 1998). There, the Georgia Supreme Court affirmed a lower state habeas court's order that G. Terry Jackson and Kenneth Carswell, Jackson's co-counsel, were unconstitutionally deficient by failing to investigate and establish the petitioner's main defense during the guilt/innocence phase. Terry v. Jenkins, 627 S.E.2d 7 (Ga. 2006). The state habeas court also found in Jenkins that the petitioner's trial counsel were "ineffective in investigating and presenting mental retardation evidence in the guilt/innocence and sentencing phases or by operating under a conflict of interest" and that "the prosecution improperly suppressed material evidence." Id. at 12. The Georgia Supreme Court, sitting in review of the state habeas court, did not address these issues because it affirmed the state habeas court's holding that Jackson and Carswell were ineffective by failing to investigate and establish the petitioner's main defense during the guilt/innocence phase. Id.

AO 72A
(Rev. 8/82)

King argues that the state habeas court's finding that <u>Jenkins</u> has no bearing on this case unreasonably applied <u>Strickland</u>'s holding that "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms . . . . considering *all the circumstances*." Dkt. No. 65 at 130 (quoting <u>Strickland</u>, 466 U.S. at 688). King elaborates that <u>Strickland</u> requires courts to "reconstruct the circumstances of counsel's challenged conduct." 466 U.S. at 689. Thus, King argues, a necessary component of reconstructing the circumstances is considering Jackson's unconstitutional performance in another death penalty case, the timing of which overlapped with the pendency of King's case.[2] King argues, then, that the state habeas court's failure to take into account Jackson's prior unconstitutional performance was an unreasonable application of <u>Strickland</u>. Such a finding would require the Court to address King's <u>Strickland</u> claims *de novo*. See <u>McGahee v. Ala. Dep't of Corr.</u>, 560 F.3d 1252, 1266 (11th Cir. 2009) ("Where we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record.").

---

[2] Jenkins was convicted in September 1995 of malice murder, which he committed in January 1993. <u>Jenkins</u>, 498 S.E.2d at 507. Karen Crosby was murdered September 14, 1994. King was arrested the same month—September of 1994. King was not tried and convicted until September 1998.

AO 72A
(Rev. 8/82)

The state habeas court's finding that <u>Jenkins</u> did not affect its decision on King's <u>Strickland</u> claims was not an unreasonable application of federal law. As the Supreme Court and Eleventh Circuit have repeatedly recognized, "the <u>Strickland</u> test of necessity requires a case-by-case examination of the evidence." <u>Johnson v. Secretary, DOC</u>, 643 F.3d 907, 931 (11th Cir. 2011) (quoting <u>Cullen v. Pinholster</u>, 563 U.S. 170, 196 n.17 (2011)). As <u>Strickland</u> states, "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Strickland</u>, 466 U.S. at 690. Thus, it is the evidence "in each case" that must be examined. <u>Johnson</u>, 643 F.3d at 931. Because <u>Strickland</u> repeatedly instructs that deficiency must be determined by focusing on the facts of the particular case, the state habeas court's finding that Jackson's deficient performance in a separate case "ha[d] no bearing" on King's case, dkt. no. 25-3 at 8 n.1, is not an *unreasonable* application of federal law. In other words, a reasonable interpretation of <u>Strickland</u> is that the facts of <u>Jenkins</u>, a separate case, did not impact the facts of King's case, and, thus, that deficient performance in the former should not be considered

when determining whether deficient performance occurred in the latter.[3]

### 2. The State Habeas Court's Discussion of King's Trial Counsel's Experience

King also argues that he is entitled to *de novo* review of his Strickland claims because the state habeas court relied on Jackson's "purportedly 'extensive experience in the representation of capital defendants' to bolster the presumption that Mr. King's counsel had performed competently." Dkt. No. 65 at 131-32 (quoting Dkt. No. 25-3 at 9-10). King cites to case law establishing the proposition that counsel may be found ineffective in a particular case even if that counsel had extensive experience.

King's argument fails for numerous reasons. First, irrespective of whether experience is dispositive on the question of trial counsel's effectiveness, experience can at least bolster the presumption that a trial counsel's conduct was objectively reasonable. King points to case law to establish that "[e]xperience is no guarantee of effectiveness." Dkt. No. 65 at 132 n.56. Then, King argues that based on this case law, the state

---

[3] The Court notes that an "incorrect" or "erroneous" application of federal law is not necessarily unreasonable. See Williams v. Taylor, 529 U.S. 362, 412 (2000) ("[A]n *unreasonable* application of federal law is different from an *incorrect* or *erroneous* application of federal law.") (O'Connor, J., concurring). Thus, even if the state habeas court was incorrect in failing to consider Jackson's conduct in Jenkins, such failure was not an unreasonable application of clearly establish federal law. To be clear, the Court has no opinion on whether the state habeas court's decision was correct or incorrect.

habeas court improperly bolstered the presumption that King's trial counsel performed competently. These two propositions are not mutually exclusive: a trial counsel with extensive experience can be presumed to have acted reasonably, but that presumption can be rebutted. Thus, King has not shown that a presumption of effectiveness based on experience is improper based on case law stating that experience is no guarantee of effectiveness.

Second, King has not shown that the state habeas court bolstered the presumption that King's trial counsel was competent by relying on trial counsel's experience. The record shows only that the state habeas court *discussed* King's trial counsel's experience. Finally, the Eleventh Circuit has stated that "[w]hen courts are examining the performance of an experienced trial counsel, the presumption that his conduct was reasonable is even stronger." Lawrence v. Sec'y, Fla. Dep't of Corr., 700 F.3d 464, 478 (11th Cir. 2012) (alteration in original) (quoting Chandler v. United States, 218 F.3d 1305, 1316 (11th Cir. 2000) (en banc)); see also Fugate v. Head, 261 F.3d 1206, 1216 (11th Cir. 2001) (finding that the presumption that "counsel's conduct falls within the wide range of reasonable professional assistance . . . is even stronger when the reviewing court is examining the performance of an experienced trial counsel"). Thus, the state habeas court's discussion of Jackson's experience was proper. For these reasons, the state habeas court's discussion of King's trial counsel's

AO 72A
(Rev. 8/82)

experience (and any reliance on the trial counsel's experience to bolster the presumption in favor of competency) was not an unreasonable application of clearly established federal law.

Because King has failed to establish that AEDPA deference does not apply, the Court will apply AEDPA deference to his Strickland claims.

## B. Trial Counsel Failed to Retain a Crime Scene Expert

King argues that his trial counsel performed deficiently by failing to retain or even consult a crime scene reconstruction expert—even though such an expert was recommended to trial counsel by the Multi-County Public Defender. Indeed, before trial, the Multi-County Public Defender's office faxed to King's lead counsel, G. Terry Jackson, the curriculum vitae of a crime scene reconstruction expert and two ballistics/firearms experts. Dkt. No. 21-6 at 19-28; Dkt. No. 19-40 at 91. King argues that his trial counsel were deficient in this respect because a crucial issue at trial was a 24-second delay from when Walter Smith exited the convenience store to the first gunshot being heard on the surveillance tape. While King acknowledges that Jackson cross-examined Smith on this issue at trial, attempting to discredit Smith's testimony on what occurred, King argues that he was deficient because a crime scene expert would have been much more powerful and persuasive to the jury. Further, he argues that even

if his trial counsel retained experts to testify as to the angle and trajectory of the bullets (as they attempted to do), such expert testimony would have done nothing to exploit the 24-second delay that was crucial to discrediting Smith's testimony. In other words, King argues that even if his trial counsel had retained a firearms/ballistics expert, his trial counsel would have still been unconstitutionally deficient by failing to also retain a crime scene reconstruction expert.

The state habeas court found that King's trial counsel did not perform deficiently by failing to contact the crime scene reconstruction expert who was recommended by the Multi-County Public Defender office. The state habeas court first reasoned that trial counsel contacted other experts, including firearms/ballistics experts, so their failure to contact the crime scene expert was not deficient. See Dkt. No. 25-3 at 31 ("[T]o be effective, counsel is not required to pursue every path until it bears fruit or until all hope withers[.]"); see also Lovett v. State of Fla., 627 F.2d 706, 708 (5th Cir. 1980) (same). The state habeas court also found that trial counsel were not deficient in failing to retain a crime scene expert because it found that the 24-second time lapse was obvious from the surveillance tape, that Jackson suggested to the jury through cross-examination of Smith and other witnesses that it was impossible for the crime to have occurred the way Smith testified that it occurred, and that for

these two reasons a lay person could have understood the significance of the time lapse such that this "was not the type of evidence that would require expert testimony." Id. at 32.

Considering that "[e]ven a dozen years before there was any AEDPA deference, the Supreme Court noted that 'strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable,'" Nance v. Warden, Georgia Diagnostic Prison, No. 17-15361, 2019 WL 1907856, at *3 (11th Cir. Apr. 30, 2019) (quoting Strickland, 466 U.S. at 690), the Court cannot say that the state habeas court's determination was unreasonable. King's trial counsel's investigation of the issues surrounding the circumstances of the shooting, including the implausibility of the timing of Scott's version of events, was thorough. King's trial counsel made significant efforts to retain a ballistics expert but was unable to secure the necessary funding.[4] Further, King's lead trial counsel, Jackson, testified that he "cross-examined the heck" out of Smith. Dkt. No. 21-10 at 33. Indeed, the trial transcripts

---

[4] King's trial counsel retained one expert, Dr. Sandra Conradi, to testify on the angle of the shot that killed the victim and had requested and obtained funds for a ballistics and firearms expert, Rees Smith. Nevertheless, Rees Smith accepted a position with the Fulton County Solicitor's Office and did not complete any work on the case. Jackson, in a letter dated April 21, 1997, informed the trial judge of Smith's recusal and the fact that Jackson "still need[ed] a ballistics expert." Dkt. No. 22-26 at 27. Jackson's co-counsel George Hagood soon after informed Jackson that he had "exhausted [their] sources trying to find [them] a firearms expert that will test for the moneys already approved," and that with the trial judge "in the frame of mind he is now, [Hagood did] not see [the trial judge] approving additional funds . . . to get an expert to verify the GBI's testing." Dkt. No. 22-17 at 12.

show that Jackson intensely cross-examined Smith on the implausibility of the timing of his version of events. See Dkt. No. 18-3 at 133-46. Thus, King's trial counsel were aware of this issue and still decided not to retain a crime scene expert but instead attempted to retain a ballistics expert. Accordingly, because King's trial counsel made an informed, strategic decision to not retain a crime scene expert, the state habeas court's holding that King's trial counsel were not constitutionally deficient for their strategic decision was not unreasonable—especially given the "doubly deferential" procedural posture applicable here. Yarborough, 540 U.S. at 6.

**C. Trial Counsel Failed to Develop and Present to the Jury Information of Mental Impairments in Members of King's Immediate Family**

King next argues that his trial counsel performed deficiently (and presumably that the state habeas court's finding to the contrary was unreasonable) by failing to develop possible mental impairments in members of King's immediate family. First, King establishes that training manuals instruct capital defense attorneys to inquire into a defendant's family members' medical and criminal backgrounds, "with a particular focus on any mental disorders for which family members have been diagnosed or merely suspected of having." Dkt. No. 65 at 217. Second, King notes that his trial counsel were on notice that King's family had a

history of mental impairments and that such evidence was important to rebutting the State's anticipated malingering allegation and to establishing that King had a mental impairment. Third, King argues that evidence showing that King's family members had mental impairments was readily available. Finally, King argues that his trial counsel's "failure to follow up on the red flags indicating a significant family history of mental illness . . . clearly fell below reasonable attorney performance." Id. at 219; see also id. at 218 (arguing that "the failure [of King's trial counsel] to develop and present readily available evidence of a family history of mental illness was unreasonable attorney performance which prejudiced the defense"). King goes so far as to argue that "nothing was done by the defense to develop this critical evidence" that King's family had a history of mental illness. Id. at 219.

In support of his position, King first provides testimony from his sister Juanita King showing that she, her mother, and her half-brothers had symptoms of mental illness. Regarding King's mother, Juanita King testified that their mother would often see people that were not there and call the names of people who did not exist. Dkt. No. 19-37 at 40. Juanita King testified that this behavior "started happening frequently" when she, Juanita, was in her early twenties. Id. Juanita King also testified that beginning in her childhood and continuing after King's trial she would hear voices that she would talk to and that she would

experience paranoia. Id. at 53–54. Turning to her brothers, Juanita King testified that her half-brother, Edert (or Elwood), would bust out grinning and giggling and "would just continually shake. He just [could not] stop it." Id. at 43. Finally, Juanita King testified that her other half-brother, Henry, would act like he was talking to someone who was not there. Id. Next King provides testimony from his brother, Andy King, Jr., about Andy's struggles with mental illness. Andy King, Jr., testified that he heard voices while in prison telling him to cut and kill himself and that he acted on these voices by trying to cut himself but was stopped by guards. Id. at 90. Andy King, Jr., further testified that he has since been diagnosed with paranoia and schizophrenia. Id. at 91. Again, King argues that his trial counsels' failure to develop and present this evidence constituted deficient performance.

The state habeas court's bottom line ruling is that King "failed to prove that trial counsel were deficient in their investigation or presentation of the chosen mental health testimony." Dkt. No. 25-3 at 52. The state habeas court's reasoning was: (1) "that trial counsel spoke with family members, [and] obtained all available medical and mental health records," id. at 53; (2) that "trial counsel were not ineffective as they provided their experts with the means available to them to uncover a detailed family history," id. at 54; and (3) that King and

Juanita King "did not reveal a detailed history of mental illness or abuse within the family," id. at 55.

The Court finds that King has failed to meet his burden of showing that no fair-minded jurist could agree with the state habeas court's decision. See Hosley v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1257 (11th Cir. 2012) ("In our en banc decision in Hill we phrased this standard 'more simply and maybe a little more clearly: if some fairminded jurists could agree with the state court's decision, although others might disagree, federal habeas relief must be denied.'" (quoting Hill v. Humphrey, 662 F.3d 1335, 1346 (11th Cir. 2011))). King utilizes the testimony of his sister, Juanita King, to show that she, King's mother, and King's half-brothers, Edert and Henry, had signs of mental illness. King argues that this testimony thus shows that King's immediate family had a history of mental illness. Nevertheless, the state habeas court found that King's trial counsel were not deficient in failing to elicit this testimony from Juanita King or King himself because trial counsel and Dr. Dickinson interviewed Juanita King and King numerous times, but neither Juanita King nor King revealed this family history of mental illness. First, investigator David Arsenault interviewed Juanita King, who provided him with information on potential witnesses. See Dkt. No. 22-16 at 87-92. Second, Jerry Caldwell, who was initially appointed as second chair but later withdrew as

AO 72A
(Rev. 8/82)

counsel because he took a job with the Attorney General's Office, conducted an extensive interview with [King] four months after his arrest. See Dkt. No. 22-24 at 110-75. One of the topics Caldwell explored with King was King's family and home life. Id. at 120-24. Third, according to Jackson, Hagood "spent a good bit of time" with Juanita King. Dkt. No. 21-10 at 48. Jackson also testified that Hagood "went down to see [Juanita] several times." Dkt. No. 19-40 at 44. Hagood testified that he personally picked up Juanita King from her house in Surrency and drove her to Savannah to interview with one of the defense's mental health experts, Dr. Dickinson. Dkt. No. 21-10 at 141-42. Hagood also testified that he interviewed Juanita himself. Id. at 123. Critically, Hagood was aware of the importance of showing a family history of mental illness, and he testified to the lengths to which he went in order to develop such evidence. Id. at 140-46; Dkt. No. 21-11 at 1-2. Hagood also testified to the defense team's efforts to develop and then present records to Dr. Dickinson to aid in Dr. Dickinson's evaluation of King. Dkt. No. 21-10 at 143-46; Dkt. No. 21-11 at 1-2. Finally, Hagood and another associate from Jackson's firm interviewed Andy King, Jr. Dkt. No. 21-6 at 13-16. While the contents of that interview focused on the circumstances of the crime, the state habeas court's factual finding—that King and Juanita King never revealed "a detailed history of mental illness or abuse within the family," dkt. no.

AO 72A
(Rev. 8/82)

25-3 at 55, even though both were interviewed on this topic many times—remains unrebutted. In short, King has not met his burden under the AEDPA. Indeed, the state habeas court's bottom-line ruling and the reasons given for it have not been rebutted but are instead supported by the record.[5]

### D. Trial Counsel Failed to Present to the Jury Certain Evidence Regarding King's Mental Health Causing Accusations of Malingering to be Unrebutted

#### 1. Trial Counsel Failed to Inform the Jury about King's Psychotic Episode at the Wayne County Jail

On October 16, 1995, at 8:00 a.m., King was placed on suicide risk watch at the Wayne County Jail. Dkt. No. 20-3 at 37. The suicide-risk-watch log notes that King was "sitting on [the] floor talking to himself and shaking." Id. at 38. On that day, King was seen by counselors of Pineland Mental Health Services. Dkt. No. 21-5 at 43. When seen by the Pineland counselors, King was brought to an office. Id. In the office, he would not respond to questions. Id. At one point, he was staring at the warden, but he turned to look at another counselor when the warden spoke about the other counselor. Id. The counselor noted that he was suicidal and diagnosed him with a "[p]sychotic disorder NOS" (not otherwise specified). Id. at 45. The notes by the counselors also stated

---

[5] Notably, King's reply brief does not focus on the state habeas court's factual findings or decision but, instead, exclusively addresses the Respondent's arguments on this claim. See Dkt. No. 78 at 40-44.

AO 72A
(Rev. 8/82)

that King "had been acting strangely for the past several weeks, i.e. talking to himself." Id. at 43. That morning he was talking to himself "saying things like, '[i]t's time to die, come on out' etc." Id. Finally, the notes stated that King was put on suicide watch and into isolation that morning and that since going into isolation he had not spoken, eaten, drank, or requested to go to the bathroom. Id.

On October 17, 1995, Dr. Hargett of the Wayne County Jail noted at 11:38 a.m. that King had not eaten or drank since the early morning of October 16 and that total communication was suspended. Dkt. No. 20-3 at 41. Dr. Hargett described that King would often sit "in semi fetal position with repeated bobbing of head and infantile type crying with catatonic like position attitude and stations." Id. Further, a Pineland counselor noted at 1:20 p.m. that he or she received a call from Dr. Hargett who said King continued to not eat, drink, or talk. Dkt. No. 21-5 at 44. Soon after that note was drafted, King was admitted to the Appling General Hospital at 1:45 p.m. Dkt. No. 20-3 at 30. The admittance note stated that King was housed at the Wayne County Jail where he had exhibited catatonic symptoms since October 16, 1995. Id. at 35. It also stated that he had not eaten since that time. Id. At the hospital, a Dr. Gene Graham diagnosed King with "[a]cute hysteria" and "[a]cting out." Dkt. No. 20-3 at 30. That

AO 72A
(Rev. 8/82)

record noted that King was admitted with the diagnosis of acute hysteria. _Id._

On October 18, a nurse's note at 7:50 a.m. stated that King was unresponsive to painful stimuli, looked straight out in front of himself, and avoided all eye contact. _Id._ at 59. Later at 10:15 a.m. the same day, a nurse noted that King was being given a bed bath when he asked for a nurse; the nurse giving the bath said "I am the nurse," and King responded: "I want to call my lawyer." _Id._ at 59. On that day, Dr. Graham noted that King was given I.V. fluids and he ordered that King be transferred back to jail. _Id._ at 34. A note titled "Discharge Plan" stated that King was discharged on October 18, 1995 to go back to the Appling County Jail. _Id._ at 52.

King describes these events as a "harrowing mental breakdown" and argues that his trial counsel were defective in failing to present this evidence to the jury. Dkt. No. 65 at 163. By presenting this evidence to the jury, King argues, the defense would have successfully rebutted the prosecution's malingering argument because "[i]t is simply more difficult to believe" that King was faking his symptoms by not eating, drinking, or using the restroom. _Id._

The state habeas court's bottom-line decision that King's trial counsel were not deficient in their presentation to the jury

during the guilt/innocence phase is not unreasonable. Turning the Court's attention to the reasons given for this bottom-line decision, the state habeas court—after thoroughly discussing and detailing trial counsel's presentation of the evidence during the guilt-innocence phase of the trial—reasoned that King's trial counsel "presented a cohesive theory for the guilt/innocence phase of trial," which included "presenting evidence to the jury that [King] was mentally retarded" and "present[ing] the testimony of two thoroughly experienced and prepared mental health experts to support this theory." Dkt. No. 25-3 at 31. For this claim, King has not shown or even argued that the state habeas court's decision involved an unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the evidence. Instead, King has merely repeated the same arguments, almost verbatim, that King set forth in his post-hearing brief in the state habeas court, which of course was not constrained by AEDPA. Compare Dkt. No. 24-28 at 63-65, with Dkt. No. 65 at 161-63. Having rejected King's arguments that the Court should review King's Strickland claims de novo, see supra I.A., the Court must analyze this claim through the lens of AEDPA. King, however, has not identified how the state habeas court's decision violated AEDPA. Because King has not met his burden under 28 U.S.C. § 2254(d)(1) or (d)(2), the petition with respect to this claim is due to be denied.

## 2. King's Evaluations at Central State Hospital

After the incident leading to King's hospitalization at Appling General Hospital in October 1995, the prosecutor moved for and the trial court ordered that King be evaluated at Central State Hospital for competency to stand trial. Dkt. No. 20-7 at 30-33. On October 27, 1995, King was admitted to Central State Hospital, where he would stay until he was discharged to the Appling County Jail on November 22, 1995. Id. at 5. Ultimately, four different doctors evaluated King in some capacity. First, Dr. Mike Whang evaluated King when he was first admitted to Central State. Then, Dr. Anita-Rae Smith evaluated King and diagnosed his condition. Third, Dr. Donald Gibson evaluated King but only on the narrow issue of whether King was competent to stand trial. Finally, Dr. Tirath Gill prepared King's final summary and included his own diagnoses of King, but it is unclear whether Dr. Gill saw King before making his diagnoses.

The admitting physician at Central State was Dr. Mike Whang. Id. at 18. He diagnosed King with "Schizophrenia, Undifferentiated Type, Unspecified." Id. Dr. Whang's mental status examination reportedly stated that King was "in no acute distress" and was "alert and tense." Id. at 21. Nevertheless, King laughed inappropriately, presented with delusions and hallucinations, and responded to voices telling him to kill himself. Id. Regarding

AO 72A
(Rev. 8/82)

his intellectual ability, while his memory was intact and he was "well oriented in three spheres," "[h]is general intellectual functioning [was] below the average," and his "[r]easoning and judgment [were] [imp]aired." Id. The admission note by Dr. Whang also reportedly stated that King's speech was "normal in quantity, soft and quiet; [that he] is able to carry brief conversation but exhibits poor concentration and comprehension." Id. at 10. King was also noted to have delusions and hallucinations, as well as voices in his head that told him to kill himself. Id. Along this line, King also stated that he saw warriors. Id.

Within 48 hours of King's admission, Dr. Anita-Rae Smith saw King. Dkt. No. 19-38 at 6. Dr. Smith was a Forensic Psychiatrist with the Forensic Services Division. Dkt. No. 20-7 at 10. When evaluating King, Smith did not have the benefit of any background materials about King's life that would typically be provided by the defense, the prosecution, or the referring court. Dkt. No. 19-38 at 11. Instead, Dr. Smith had only the background information that King provided and some progress notes from Dr. Donald Gibson stating that King had been exhibiting strange behavior in jail, such as "sit[ting] in the corner crying." Dkt. No. 20-7 at 9.

Turning to Dr. Smith's Medical-Behavioral Assessment and History report, she noted in the Developmental/Past History

AO 72A
(Rev. 8/82)

section that King did not know whether he was a full-term or a premature baby, whether he had any birth injuries or defects, whether he was immunized, whether he ever had mumps, measles, chickenpox, or any other childhood illness, or when he began to walk, talk, or became potty trained. Dkt. No. 20-7 at 10. Further, King denied knowing anything about his childhood, his educational history, his work history, his religious history, his sexual history, or whether his family had any history of mental illness or serious physical illnesses. Id. King also denied ever using drugs or alcohol. Id. Under the section "rehabilitation potential," Dr. Smith noted that King was "[v]ery guarded." Id.

Dr. Smith noted that King "seemed to be playing games, would not respond to the questions, [and] said that he did not know anything that was being asked of him." Dkt. No. 20-7 at 10. Along this line, Dr. Smith observed that King seemed to be "laughing to himself," and that he "voluntarily appeared to [be] laughing to himself and acting in an inappropriate manner." Id. Under the "diagnosis" subsection, Dr. Smith diagnosed King under "Axis I" as malingering but also noted to "[r]ule out Psychotic disorder," meaning that it was questionable whether he had a psychotic disorder such that it needed to be ruled out. Id.; Dkt. No. 19-38 at 10. Under "Axis II," Dr. Smith diagnosed King with "[a]ntisocial personality disorder." Dkt. No. 20-7 at 10.

AO 72A
(Rev. 8/82)

Dr. Smith also completed a "Mental Status Exam." Dkt. No. 20-7 at 11-12. Under the subsection "Attitude," Dr. Smith stated that King "presents as though he is malingering, manipulative, pretending, laughs to himself inappropriately, responds poorly to questions and was not cooperative." Id. at 11. Under "Use Of Language," Dr. Smith stated that King's "communication was good when he decided to cooperate." Id. Under "Hallucinations," Dr. Smith noted that King was "having auditory hallucinations and seeing warriors that no one else sees," but Dr. Smith found that King "was not descriptive of the warriors or descriptive of the visual hallucinations." Id. King was also noted as having been "oriented as to person, place, time and legal situation" and "was functioning [at] below average intelligence." Id. Regarding "Reality Reasoning and Judgment," King "had only fair reality testing" and "limited insight and poor judgment." Id. at 12. Dr. Smith's final diagnoses were the same: Dr. Smith diagnosed King under "Axis I" as malingering and also noted to "[r]ule out Psychotic disorder"; and under "Axis II," Dr. Smith diagnosed King with "[a]ntisocial personality disorder." Id. Dr. Smith testified at the evidentiary hearing in the state habeas court that the malingering diagnosis went "toward the diagnosis of a perhaps borderline or mild mental retardation or to a psychotic diagnosis." Dkt. No. 19-38 at 13-14.

AO 72A
(Rev. 8/82)

Turning to the purpose for King's transfer to Central State, King was interviewed by the Forensic Evaluation Team on October 31 and November 14, 1995 to determine whether he was competent to stand trial. Dkt. No. 20-7 at 13. Dr. Donald Gibson completed the report, and he reported that King was found to be competent to stand trial. Id. at 15. Under the subsection "Mental Status Examination," Dr. Gibson reported:

> At the time of admission on mental status examination, he was alert, oriented and appeared cooperative. [King] would not answer all questions but admits to a history of auditory hallucinations since childhood. He was vague about the contents of the hallucinations except to reveal that lately they have been telling him to kill himself. He reports visual hallucinations of a warrior but was again not very forthcoming about the details. It is significant that prior to his transfer to this facility he had been tearful, laughing inappropriately and expressing suicidal ideation. On interview, his affect was appropriate to his mood which he described as good. He denied suicidal or homicidal ideation. He did, however, sometimes laugh inappropriately and his affect was sometimes not appropriate to the conversation. He was able to abstract. His judgment and insight were poor. He could not or would not perform simple calculations. His recent and remote memory were intact. His speech was normal in rate and rhythm.

Id. at 14.

On November 22, 1995, King was discharged from Central State. Id. at 5. The final summary report was created by Dr. Tirath Gill. Id. at 8. Dr. Gill was also a forensic psychiatrist in the forensic division. Dkt. No. 19-37 at 157. Dr. Smith would have created the final summary, but she was likely absent when King was discharged. Dkt. No. 19-38 at 13-14. According to Dr. Smith, Dr.

32

Gill took her evaluation, "added a little to it at the end," and came "up with his own diagnosis." Id. at 15. The "little" that Dr. Gill added was to note under the section "Course of Patient with Regard to Each Clinical Problem" that King's first problem of "[a]ltered sensory perception related to disturbance in thought evidence by auditory hallucinations . . . was resolved as he did not have any thought disorder and was felt to be malingering and improved without any medications." Dkt. No. 20-7 at 7. Under "Final Diagnosis," the only change Dr. Gill made to Dr. Smith's diagnoses is that Dr. Gill removed "[r]ule out psychotic disorder." Compare id. at 8 with Dkt No. 20-7 at 12. Dr. Smith testified that thought disorders are "a category of mental illness that involve a break with reality, where a person is having experiences or thoughts that aren't real." Dkt. No. 19-39 at 19.

Even though Dr. Gill found that King's problem of altered sensory perception was resolved, Dr. Smith testified at the state habeas evidentiary hearing that the fact that King stabilized does not rule out a psychotic disorder. Dkt. No. 19-38 at 16-17. Dr. Smith elaborated that a person with a psychotic disorder may have stabilized at Central State because it is a more relaxed environment than a jail; the more relaxed environment can help the patient "go into the flight of reality." Id. at 17. Thus, if Dr. Smith had completed the final summary, she would have still included "rule out psychotic disorder." Id. at 16.

As to his stint at Central State Hospital, King argues that his trial counsel were deficient in two intertwined respects. First, King argues that his trial counsel were deficient in failing to provide the Central State doctors with other available evidence showing King was mentally impaired. Second, King argues that his trial counsel were deficient by failing to speak with the Central State doctors and elicit information from them regarding their evaluations of King. These alleged deficiencies are connected by King's factual representation that his trial counsel never contacted the Central State doctors who evaluated King. Presumably, King also argues that the state habeas court's determination that King's trial counsel were deficient in neither respect was unreasonable.

Regarding the first deficiency, King argues that his trial counsels' failure to provide the Central State doctors with background information, which would have fully informed their evaluations, fell below the prevailing norms of capital defense representation. In support, King points to Dr. Smith's testimony that the doctors at Central State "[u]sually" got a package of information regarding a patient from the prosecution and defense. Dkt. No. 19-38 at 11. Nevertheless, Dr. Smith then immediately stated that "[s]ometimes we do, and sometimes we don't." Id. Dr. Smith later clarified that "[m]ost of the time" attorneys provided background information, but that "sometimes the attorneys

AO 72A
(Rev. 8/82)

didn't." <u>Id.</u> at 22-23. Dr. Gibson also testified at the state habeas evidentiary hearing that it was "most definitely" "[m]ore likely" that he would be provided with background information by defense attorneys in death penalty cases. Dkt. No. 19-40 at 13. Notably, King does not explain how or argue that the state habeas court's decision violated either § 2254(d)(1), (d)(2), or both.

Regarding the second deficiency, King argues that his trial "counsel had a duty to do everything reasonably likely to uncover evidence to rebut the anticipated argument by the state that" King was malingering. Dkt. No. 65 at 170. Further, King argues that under the prevailing norms of capital defense in Georgia such reasonable efforts "included contacting the doctors at Central State to discuss their diagnosis and provide helpful information." <u>Id.</u> Along this line, King argues that even if his trial counsel made the strategic decision to not provide the Central State doctors with information, they were still deficient in failing to at least contact the Central State doctors and gain information from them that could have helped rebut the malingering diagnosis. King continues that "[e]ven a cursory review of the Central State records indicates that making contact with the Central State doctors 'would [not] have been fruitless.'" Dkt. No. 65 at 173 (quoting <u>Wiggins</u>, 539 U.S. at 525) (alteration provided by King). In support, King points to the state habeas evidentiary hearing

where Dr. Gibson testified that he did not agree with the malingering diagnoses of the other Central State doctors.

The state habeas court found with regard to these alleged deficiencies that King's trial counsel were not deficient because they "independently gathered all records relevant to [King's] background and obtained their own independent mental health evaluation." Dkt. No. 25-3 at 59. In addition, the state habeas court found that "trial counsel would not want to potentially open the door for an even more aggravating diagnosis by providing more information to the State's potential experts." Id. at 60.

The state habeas court's decision does not violate § 2254(d)(1) or (d)(2) considering Jackson's testimony at the state habeas evidentiary hearing. First, Jackson testified that he did not know whether he called the Central State doctors. See Dkt. No. 19-40 at 111 ("I don't know if I called them. I don't know."). Second, Jackson testified that he "called Central State doctors before, and they are the most high and mighty people you'll ever talk to [ ] in your life." Id. at 110-11. He stated that he had "called them [in the past] and gotten that kind of reaction." Id. at 111. As to Jackson's experience of providing Central State doctors with information on his clients, Jackson testified that "[s]ometimes" he would provide them with information, but that it "depends on what the information is." Id. at 54. He continued:

"If it had something to do with his psychiatric and it didn't have any detrimental information and I had the opportunity, then I would. Not that they would look at it. You get the reports and they're like they change the name and age and everybody's fine." Id. at 54-55. Finally, the record shows (from notes that Jackson placed in King's Central State records) that Jackson reviewed King's Central State records.

Taking these facts together, they show that Jackson was aware of King's time at Central State and those doctors' evaluations and diagnoses, that Jackson had dealt with Central State doctors several times while representing others, that Jackson's experiences dealing with Central State doctors were very negative, that Jackson would have (and may have in King's case) provided the Central State doctors with information on King if that information would not have been detrimental to King, and that Jackson may have contacted the Central State doctors in King's case. King, then, has not even shown that his trial counsel did not contact the Central State doctors, which is the core factual basis of these claims. Further, Jackson had a strategic reason, based on experience, for not sharing what he deemed to be detrimental information with the Central State doctors. Indeed, Jackson testified that he would provide Central State doctors with information when he deemed it appropriate. For these reasons, King has fallen short of his burden of showing that no fairminded

jurist could agree with the state habeas court's decision that King's trial counsel were not deficient with respect to giving and receiving information from the Central State doctors.

### E. The Gateway Records

King next argues that his trial counsel were unconstitutionally deficient by failing to provide the Central State doctors, King's experts, and the jury with the Gateway Records. On July 24, 1997, King completed an intake assessment at the Gateway Center for Human Development. Dkt. No. 20-7 at 47-48. The "Individualized Service Plan" completed by King's case coordinator at Gateway stated that Gateway was to provide King with individual counseling, psychiatric evaluation, and a medication evaluation. Dkt. No. 20-8 at 1. King's intake assessment on July 24, 1997 lasted for 1.5 hours. Id. at 2. King next came to Gateway on August 6, 1997, when he was evaluated for a total of fifteen minutes by Dr. C.E. Beck. Dkt. No. 20-7 at 74; Dkt. No. 20-8 at 2. Dr. Beck diagnosed King with schizophrenia undifferentiated type. Dkt. No. 20-7 at 74. He also prescribed to King Thioridizine (Mellaril), an anti-psychotic, and amitryptiline (Elavil), an anti-depressant. Id. at 74, 75; Dkt. No. 20-1 at 34. Dr. Beck saw King five more times over the next year, each time for a total of fifteen minutes, and each time Dr. Beck diagnosed King with schizophrenia undifferentiated type and

prescribed the same medications. Dkt. No. 20-7 at 69-74; Dkt. No. 20-8 at 2. On September 14, 1998, King's trial counsel received these Gateway records. Dkt. No. 20-7 at 47. King argues that his trial counsel's failure to provide these records to his experts or to present these records to the jury constituted deficient performance.

The state habeas court rejected this claim on five grounds: (1) "the Gateway records document the same experiences and symptoms that are documented throughout [King's] other hospitalizations and jail records, which were all provided to defense experts," dkt. no. 25-3 at 66, "including that [King] was prescribed anti-psychotic medication," id. at 68; (2) "the Central State Hospital records reveal that [King] was initially diagnosed as suffering from schizophrenia, undifferentiated type and there is no question that [King]'s mental health experts were provided with those records," id. at 69; (3) "Dr. Beck's examination was no more thorough or accurate than any of the other evaluations of [King]," id. at 67; (4) "there would have been credibility concerns with Dr. Beck's testimony based on the limited resources utilized by him in his evaluation and the fact that he only met with [King] for a total of an hour and a half over a one year period," id.; and (5) trial counsel's "own experts did not see a diagnosis of schizophrenia," id.

First, King argues that the state habeas court unreasonably discounted Dr. Smith's opinion because Dr. Smith stated she would have given a different diagnosis had she had King's Gateway records (from 1997) at the time of her evaluation (in 1995). This argument, however, mischaracterizes the state habeas court's reasoning. The state habeas court did note that Dr. Anita-Rae Smith, who evaluated King at Central State, testified at the state habeas evidentiary hearing that her findings from her evaluation of King at Central State would have changed if she had the Gateway records, and the state habeas court also noted that the Gateway records were not in existence at that time. However, the state habeas court did not reject King's claim on the ground that Dr. Smith's assertion was based on a mistake of fact; the court simply pointed out that Dr. Smith's testimony was fallacious because she could not have had the Gateway records from 1997 at the time she evaluated King in 1995. Indeed, the state habeas court recognized King's argument that his trial counsel should have provided these records to the Central State evaluators *at any point prior to trial* in 1998, and the state habeas court accordingly analyzed this claim from that posture. See Dkt. No. 25-3 at 69 (finding that King's trial counsel were not deficient in failing to provide the Gateway records to the Central State doctors or his own experts).

Next, King argues that the state habeas court unreasonably applied clearly established law by "'discount[ing] entirely the

AO 72A
(Rev. 8/82)

effect that [Dr. Smith's] testimony might have had on the jury,'" dkt. no. 65 at 195 (alterations in original) (quoting, Porter v. McCollum, 558 U.S. 30, 43 (2009)), and by finding that Dr. Beck's credibility would have been challenged. On the first point, King points to Dr. Smith's testimony at the state habeas evidentiary hearing; there, Dr. Smith testified that if she had had the Gateway records and had heard Dr. Beck testify about those records when she diagnosed King, then she "would have definitely taken out the diagnosis of malingering, and [ ] would have made the diagnosis of a psychotic disorder." Dkt. No. 19-38 at 20. King represents that Porter found that a hypothetical challenge to a habeas witness's credibility is a "flatly unreasonable basis on which to 'discount entirely' or 'to irrelevance' evidence and expert testimony documenting a defendant's major mental illness." Dkt. No. 65 at 195-96 (quoting Porter, 558 U.S. at 43). In Porter, the United States Supreme Court indeed found that the state habeas court "did not consider or unreasonably discounted the mitigation evidence adduced in the postconviction hearing" that the petitioner had "a brain abnormality and cognitive defects." 558 U.S. at 42-43. Nevertheless, the Supreme Court was analyzing Strickland's *prejudice* prong, not the deficient performance prong at issue here. Thus, the portion of Porter that King relies on is not instructive on the deficient performance prong, and the state

AO 72A
(Rev. 8/82)

habeas court could not have unreasonably applied it with regard to its deficient performance analysis.[6]

Nevertheless, the state habeas court did not unreasonably discount the testimony of Dr. Smith. Rather, the state habeas court first noted that Dr. Smith's testimony relied on the flawed assumption that it was possible for her to have had the Gateway records when she made her diagnosis. This was, of course, not possible because the Gateway records did not exist at the time Dr. Smith made her diagnosis. Second, the state habeas court found that Dr. Smith had the same materials as the Gateway evaluators, but Dr. Smith made the diagnosis she did. King does not address this finding. The state habeas court then noted that Dr. Smith spent more time with King before making her diagnosis and that Dr. Beck only spent *fifteen minutes* with King before making his diagnosis. Finally, the state habeas court discounted Dr. Smith's testimony at the evidentiary hearing in part because she was testifying more than 10 years after her evaluation of King. Thus,

---

[6] The Court notes that even if King were addressing the prejudice prong of Strickland, his characterization of Porter as standing for a *per se* rule that a habeas court cannot discount a habeas witness's testimony over credibility concerns is incorrect. See Whatley v. Warden, Ga. Diagnostic & Classification Ctr., No. 13-12034, 2019 WL 2536841, at *25-26 (11th Cir. June 20, 2019) (holding that the Supreme Court of Georgia did not unreasonably discount two experts' affidavits where the petitioner did not rebut the Supreme Court of Georgia's factual finding that the two experts would have been "of questionable credibility and value" if they had testified at the petitioner's trial (quoting Whatley v. Terry, 668 S.E.2d 651, 659 (Ga. 2008))).

the state habeas court did not *unreasonably* discount Dr. Smith's testimony but did so on reasonable bases. For these reasons, then, the state habeas court's finding on this issue was not based on an unreasonable application of clearly established law.

As to the second point, King argues that the state habeas court unreasonably applied clearly established law by finding that Dr. Beck's credibility would have been challenged. For clearly established law, King again looks to the portion of Porter that analyzed prejudice. King represents that Porter found that the "fact that [a] doctor's conclusions about [a] defendant's mental impairments would have been subject to [a] credibility challenge was not [a] reasonable basis for [the] state court to conclude [that] counsel [was] not deficient for failing to present it," dkt. no. 65 at 196 (citing Porter, 558 U.S. at 43). As just discussed, this part of Porter addresses the prejudice prong. Because Porter was analyzing Strickland's prejudice prong, the state habeas court could not have unreasonably applied Porter when analyzing this claim under Strickland's deficiency prong.

Nevertheless, the state habeas court may have "discounted entirely" the testimony of Dr. Beck, but it did not do so "unreasonably." Rather, the state habeas court considered the effect of Dr. Beck's testimony and found that it had serious credibility concerns. For this reason, the state habeas court

AO 72A
(Rev. 8/82)

*reasonably* discounted the effectiveness of Dr. Beck's testimony when it addressed whether King's trial counsel were deficient by not presenting Dr. Beck's testimony to the jury. While King may disagree with the state habeas court's findings on this matter, King has not shown why that finding was unreasonable. For these reasons, the Court finds that the state habeas court did not unreasonably apply <u>Porter</u> or clearly established federal law.

King also argues that the state habeas court made two unreasonable findings of fact: (1) that the Gateway records had credibility concerns, and (2) that the Gateway records and Dr. Beck's testimony contained no new information.

As to the first purportedly unreasonable finding of fact, King only argues that it is "patently unreasonable." Dkt. No. 65 at 196. Such a conclusory argument falls far short of showing by clear and convincing evidence that this factual finding was incorrect.

As to the second finding of fact, King has not shown that the state habeas court's decision on this issue was based on this factual determination. As already discussed, the state habeas court found that "it is clear that trial counsel were not deficient . . . by[ ] not presenting the testimony of Dr. Beck [or by extension the Gateway records] as there would have been credibility concerns with Dr. Beck's testimony based on the limited resources

utilized by him in his evaluation and the fact that he only met with [King] for a total of an hour and a half over a one year period." Dkt. No. 25-3 at 67. The state habeas court also determined that King's trial counsel were not deficient in providing the Gateway records because it was "entirely reasonable for trial counsel to rely on their experts' assessments of [King]." Id. at 69. The state habeas court based this determination on the factual finding that King's trial counsel enlisted four mental health experts, "all of whom diagnosed [King] as malingering, or at least having malingering tendencies." Id. Thus, King has not shown that the state habeas court's decision—that King's trial counsel were not deficient in failing to provide the Gateway records or Dr. Beck's testimony to King's experts, the Central State doctors, or the jury—"was *based* on" the allegedly unreasonable determination of facts that the Gateway records and Dr. Beck's testimony contained no new information. 28 U.S.C. § 2254(d)(2) (emphasis added). Rather, the state habeas court's decision shows that it was based on the different finding of facts listed above.

Because King has failed to show that the state habeas court's adjudication of this claim violated either 28 U.S.C. § 2254(d)(1), (d)(2), or both, King's claim fails.

**F. Trial Counsel Mistakenly Presented Lay Witness Testimony Regarding King's Intellectual Limitations and Vulnerability to Manipulation During the Sentencing Phase but not the Guilt-Innocence Phase**

King next argues that the state habeas court's finding—that his trial counsel were not unconstitutionally deficient by failing to present Marjorie Cox, Mr. King's former foster mother, and Miriam Mitchum,[7] Mr. King's Department of Juvenile Justice case worker, as witnesses at the guilt-innocence phase of King's trial—was unreasonable. While Cox and Mitchum testified at the Sentencing Phase, they did not testify at the guilt-innocence phase of trial. King argues that at the guilt-innocence phase "their testimony would have made a difference in terms of convincing jurors that Mr. King was genuinely mentally retarded beyond a reasonable doubt." Dkt. No. 65 at 226 (emphasis omitted). King goes on to argue that his trial counsel had no strategic basis for not calling Cox and Mitchum at the earlier phase and that Jackson even testified during the state habeas evidentiary hearing to this effect.

The state habeas court held that King's trial counsel were not deficient in failing to call Cox or Mitchum at the guilt-innocence phase. The Court reasoned that "after a thorough

---

[7] The state habeas court refers to Mitchum as "Marion Mitchum." Dkt. No. 25-3 at 37. King refers to Mitchum as "Marrion Mitcham." Dkt. No. 65 at 239. The transcript from the sentencing phase of King's trial refers to Mitchum as "Miriam Mitchum." Dkt. No. 17-9 at 3, 109. The Court will follow the transcript from the sentencing phase.

investigation" King's trial counsel made "a reasonable strategic decision" to not call these witnesses during the guilt-innocence phase. Dkt. No. 25-3 at 41. The state habeas court further reasoned that trial counsels' strategic decision was based on the facts that "[b]oth lay witnesses had little to offer to [King's] substantive claim of mental retardation, and what little they could add, the defense experts covered in their testimony." Id.

First, the state habeas court's determination that King's trial counsel made a "reasonable strategic decision" not to call Cox or Mitchum during the guilt-innocence phase was not an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2), nor has King shown by "clear and convincing evidence" that this factual determination was incorrect, 28 U.S.C. § 2254(e)(1). As an initial matter, "'[t]he question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct.'" Fotopoulos v. Sec'y, Dep't of Corr., 516 F.3d 1229, 1233 (11th Cir. 2008) (quoting Provenzano v. Singletary, 148 F.3d 1327, 1330 (11th Cir. 1998)). Further, although not directly on point, it is relevant to note that "because ineffectiveness is a question which we must decide, admissions of deficient performance by attorneys are not decisive." Harris v. Dugger, 874 F.2d 756, 761 n.4 (11th Cir.

1989). Along this line, "even counsel's own hindsight regarding what might have influenced the jury cannot support a finding of deficient performance." Grayson v. Thompson, 257 F.3d 1194, 1222 (11th Cir. 2001).

With the distorting effects of hindsight in mind, King cannot satisfy his burden of showing that the state habeas court's factual finding was unreasonable or incorrect. King first argues that Cox and Mitchum "were objective, impartial and credible observers of Mr. King's level of intellectual functioning, who, as all trial attorneys acknowledged, would have added much needed credibility to the intellectual disability case at the guilt-innocence phase of trial." Dkt. No. 65 at 225. King then points to Jackson's testimony at the state habeas hearing. There, Jackson testified that he "[a]bsolutely" should have called Cox and Mitchum as witnesses during the guilt-innocence phase, and that he did not have a strategic reason for not doing so. Dkt. No. 19-40 at 96. Jackson, however, also testified as to a strategic reason why he did not call Cox and Mitchum during the guilt/innocence phase: he "didn't know what they were going to say." Dkt. No. 21-10 at 69; see also Dkt. No. 19-40 at 96 (Jackson testified "what did I know about what [Cox and Mitchum] were going to say during the guilt/innocence phase is the only question I have"). Jackson established the reasonableness of this strategic reason for not calling Cox and Mitchum with an anecdote from another case where

Jackson "had a teacher . . . who we felt was going to be wonderful who got on the stand and went off, you know." Dkt. No. 21-10 at 66. The record shows that Jackson contradicted his testimony of not having a strategic reason by setting forth a strategic reason for not calling Cox and Mitchum during the guilt-innocence phase. Thus, King has not sufficiently rebutted the state habeas court's factual finding that King's trial counsel made a "reasonable strategic decision." Dkt. No. 25-3 at 41. Accordingly, King cannot show that the state habeas court's decision was based on an unreasonable determination of the facts in light of the record evidence.

### G. Trial Counsel Failed to Investigate and Present a Complete and Accurate Life Profile of King in Mitigation

King next argues that his trial counsel unreasonably failed to investigate and present a complete and accurate life profile of King in mitigation of punishment at sentencing. King represents that the jury "heard incomplete and ultimately misleading testimony at sentencing" from Juanita King and Miriam Mitchum, dkt. no. 65 at 282-83, and that the jury never heard from other readily available mitigation witnesses. Ultimately, King contends that his trial counsel were deficient in failing "to convey a far more accurate, complete, and dire picture of the circumstances of Mr. King's upbringing to paint him in a far more sympathetic light." Id. at 284.

As to Juanita King, King argues that while she provided at sentencing "rudimentary facts about the impoverished circumstances" of the King siblings' "upbringing with their alcoholic parents," she "could have offered far more detailed and compelling information about the chaos of her family's circumstances during her and Mr. King's childhood." Dkt. No. 65 at 284. King then details numerous points about which Juanita King testified at the state habeas evidentiary hearing but that the jury did not hear at any phase of King's trial. Id. at 284-87.

King also argues that had his trial counsel been even "minimally conscientious about seeking out and speaking with *other* available witnesses," then trial counsel would have spoken with Andy King Jr., King's friend James Moore, and King's neighbors Mildred Wallace, Verdell Thomas, Katie Pressley, Sally Mae Hayes, and Deborah Hayes, who all "could have offered harrowing details about the neglect, violence, and chaos" of King's childhood home. Dkt. No. 65 at 289. King then recounts the testimony that these potential witnesses could have given at King's sentencing. Id. at 289-98.

As to King's trial counsels' investigation of mitigating evidence claim, the state habeas court determined that King's trial counsel "conducted a thorough investigation of [King's]

background," dkt. no. 25-3 at 33, and that King "failed to prove, even with the new evidence presented in [the state] habeas proceedings, most of which is cumulative and of questionable credibility, that trial counsel were deficient in their investigation," id. at 40. As to the presentation of mitigating evidence claim, the state habeas court's bottom-line ruling was that King's "trial counsel's presentation of mitigation evidence was not unreasonable . . ., particularly in light of trial counsel's thorough investigation, their strategic decisions, 'eliminat[ing] the distorting effects of hindsight' and reviewing trial counsel's conduct from counsel's perspective at the time." Dkt. No. 25-3 at 51 (alteration in original) (quoting Strickland, 466 U.S. at 690). The state habeas court reasoned that King's case was "not a case where trial counsel did not present mitigation witnesses." Id. Instead, the court reasoned that King "merely assert[ed] [that] trial counsel should have presented more witnesses to testify . . . and that those who did testify should have testified to something different." Id.

Looking through the lens of "doubly deferential" review of trial counsels' investigation and presentation of King's life profile, King has not met his burden under 28 U.S.C. § 2254(d). See Yarborough, 540 U.S. at 6 ("Judicial review of a defense attorney's [performance] is therefore highly deferential–and doubly deferential when it is conducted through the lens of federal

AO 72A
(Rev. 8/82)

habeas."). The state habeas court detailed the thorough investigation that King's trial counsel undertook to uncover King's life profile and mitigating evidence related thereto. See Dkt. No. 25-3 at 35-40. In this claim, King focuses on his trial counsels' alleged failure to "seek[ ] out and speak[ ] with *other* available witnesses." Dkt. No. 65 at 289. In essence, King argues that his trial counsel should have done more.

"To determine whether 'trial counsel should have done something more' in their investigation, 'we first look at what the lawyer[s] did in fact.'" Raulerson v. Warden, No. 14-14038, 2019 WL 2710051, at *5 (11th Cir. June 28, 2019) (quoting Grayson, 257 F.3d at 1219) (alteration in original). The state habeas court found that King's trial counsel (1) used a checklist that identified areas of investigation, (2) interviewed numerous individuals, and (3) attempted to interview anyone they could find that knew anything about King, including individuals identified from their review of the records. See Dkt. No. 25-3 at 35. The state habeas court also recognized that King's trial counsel had much difficulty locating potential mitigating witnesses because King and his family members "did not direct counsel to these types of potential witnesses." Id. at 36. Notably, King *does not* challenge these factual findings, which are presumed correct. Based on these factual findings, the state habeas court's decision that King's trial counsels' investigation was constitutionally

adequate was reasonable. See Raulerson, 2019 WL 2710051, at *6

("Although [the petitioner] has presented additional affidavits

from extended family members, teachers, and acquaintances that

counsel could have interviewed, that more investigation *could* have

been performed does not mean his counsel's investigation was

inadequate.").

King next argues that his trial counsel were deficient in

their presentation of mitigating evidence related to his life

history at sentencing. The state habeas court, however, reasonably

determined that King's trial counsel were not deficient. Even

though King identifies *some* evidence that did not reach the jury,

"more is not always better." Chandler v. United States, 218 F.3d

1305, 1319 (11th Cir. 2000). Indeed, King's life history was

detailed by Cox and Mitchum. Mithcum's testimony was particularly

adept at presenting King's life history. Mitchum delineated the

decrepit, dilapidated house in which the King family resided. See

Dkt. No. 17-9 at 112-13. Mitchum described the extent of King's

parents' alcoholism: "As to the, the parents, there was not a time

that I can recall in my memory that I ever spoke with them either

in person or on the phone that they were sober." Id. at 113; see

also id. at 114 (testifying that she spoke with King's parents

"[t]wenty or thirty or more times"). Finally, Mitchum and Juanita

King testified at sentencing to the rampant fighting that occurred

between King's mother and father, and how King would often be caught in the middle of it all. Id. at 84, 114-15.

Cox's and Mitchum's testimonies also highlighted the dangers of testifying on a defendant's life history; the government can hit back—and it did. Through its cross-examination of Cox and Mithcum, the State highlighted King's checkered past, including numerous criminal violations throughout his childhood. As the Eleventh Circuit recently explained:

> "The type of 'more-evidence-is-better' approach advocated by [the petitioner] might seem appealing—after all, what is there to lose?" Wong v. Belmontes, 558 U.S. 15, 25, 130 S. Ct. 383, 175 L.Ed.2d 328 (2009). But there can be a lot to lose. Id. By presenting a "heavyhanded case" of mitigation evidence, counsel "would have invited the strongest possible evidence in rebuttal." Id. A lawyer can reasonably "fear that character evidence might, in fact, be counterproductive." Chandler, 218 F.3d at 1321. Particularly right before the jury decides a defendant's penalty, counsel can reasonably limit the mitigating evidence he presents to avoid exposure "to a new string of [g]overnment witnesses who could testify to Petitioner's bad acts." Id. at 1323.

Raulerson, 2019 WL 2710051, at *6 (second alteration in original). For example, King argues that his trial counsels' failure to argue and draw out testimony from Juanita King that King's mother's death "triggered a significant acceleration of his developing psychotic illness," dkt. no. 65 at 286, constituted deficient performance. But considering that such evidence could have backfired due to evidence of King's behavior both criminally and mentally prior to his mother's death (and by the obvious fact that the death of a

loved one is not an excuse for murder), King has not shown that the state habeas court's decision was unreasonable.

For these reasons, the state habeas court's decisions that King's trial counsel were not deficient in their investigation or presentation of mitigating evidence about King's life history were reasonable.

### H. Trial Counsel Failed to Use Certain Records to Rebut the Malingering Allegation, Support King's Intellectual Disability Argument, and Provide Mitigating Factors

#### 1. King's School Records

King argues that his trial counsels' failure "to present readily available mitigating information from the school records in all of its tragic detail was unreasonable and prejudicial in that it deprived the jury of a full and accurate profile of Mr. King's mental health status and life history." Dkt. No. 65 at 236. The state habeas court found that King's trial counsel were not deficient in this respect. After noting that King's school records were tendered as defense exhibits at trial, the state habeas court reasoned that King's "trial counsel made a reasonable, strategic decision in not sending the records as exhibits with the jury." Dkt. No. 25-3 at 32. This factual finding has not been rebutted by King. King merely recasts his same arguments that he presented to the state habeas court. Compare Dkt. No. 24-29 at 20-23, with Dkt. No. 65 at 232-37. The Court is not reviewing

AO 72A
(Rev. 8/82)

this claim *de novo* but instead must focus on the decision and reasoning of the state habeas court. King must abide by the dictates of AEDPA, and his failure to satisfy either § 2254(d)(1) or (d)(2) is fatal to this claim.

### 2. The Department of Youth Services and Baxley Wilderness Institute Records

King argues that the state habeas court's decision—that King's trial counsel were not deficient for failure both to highlight for the defense experts and to present to the jury records from the Department of Youth Services ("DYS") and the Baxley Wilderness Institute ("BWI")—was unreasonable. King contends that these records "repeatedly reference strange behavior manifested by Mr. King long before his arrest in his case," which would have rebutted the State's malingering argument. See Dkt. No. 65 at 199. Further, King argues that these records would have supported the defense's theory that King was a follower and that he followed Smith the night of the robbery.

This claim suffers the fatal flaw of not showing how the state habeas court's decision satisfies 28 U.S.C. § 2254(d)(1), (d)(2), or both; again, King merely recasts this claim in this Court as he did in the state habeas court—as if this Court were reviewing it *de novo*. Turning to the state habeas court's decision and reasoning, the state habeas court first noted that King's school

records were tendered as defense exhibits at trial and then found that King's "trial counsel made a reasonable, strategic decision in not sending the records as exhibits with the jury." Dkt. No. 25-3 at 32. The state habeas court further found that "the defense experts clearly testified about the information contained within those records." Id. The state habeas court concluded that the evidence from these records "would have been cumulative, providing [no][8] more information about [King's] background, however, as trial counsel was also concerned about the possible aggravating nature of the records, [King] failed to establish that trial counsel were deficient in their use of these record[s] prior to or during trial." Id. at 33. King has not shown how the state habeas court's decision was unreasonable. Thus, King's claim must fail.

Nevertheless, the state habeas court's decision was, in fact, reasonable. While the Department of Youth Services and BWI records contain information that can be construed to support King's defenses of intellectual disability and being a follower, the records also contain information supporting the theory that King was more than capable of being a model citizen but that at times, especially when he was living at home, he chose not to be. This theory can be flipped to support the defense theory of highlighting the negative effects that King's homelife had on him. It was not

---

[8] It appears the trial court's failure to include "no" was a typo.

unreasonable, however, to make the strategic decision to not publish such evidence on the basis that the jury would not be so moved but would instead focus on how King could control his behavior when he wanted to (significantly undercutting his intellectual disability defense). Indeed, King characterizes the BWI records as showing that King "*thrived* at BWI and wanted to be in that environment." Dkt. No. 65 at 255 (emphasis added). Further, these records contain information on King's criminal past, which is of course aggravating. By ignoring the aggravating information in these records that—as the state habeas court found—led King's trial counsel to make the reasonable and strategic decision to not present these records to the jury or focus on these records when questioning Dr. Dickinson on the witness stand, King cannot show how the state habeas court's decision was unreasonable.

### 3. The Department of Family and Children's Services Records

King argues that his trial counsel were deficient in failing to obtain and utilize records on King's family from the Department of Family and Children's Services ("DFACS"). King continues that the state habeas court's decision to the contrary was both based on an unreasonable factual determination and constituted an unreasonable application of clearly established federal law. The state habeas court's factual finding at issue was that the DFACS "records largely contained the same information as was included in

other records gathered by trial counsel, and ultimately contained information which could be aggravating to [King]." Dkt. No. 25-3 at 14. As to the alleged unreasonable application, King argues that this factual finding "unreasonably applies Strickland in that merely because the records contain some negative commentary about a teenaged Mr. King[, the court] cannot reasonably justify 'discounting to irrelevance' the potential mitigating impact of the records substantively or as a springboard for further mitigation investigation." Dkt. No. 65 at 264 (quoting Porter, 558 U.S. at 43). As to whether this factual finding was unreasonable, King argues that it was for two reasons. First, it was unreasonable because "the records contain some of the only truly detailed descriptions (generated by a government agency) of the destitution and chaos of the King family home, especially during Mr. King's early teen years." Dkt. No. 65 at 264. Second, King argues that the finding was unreasonable "because they contain valuable information about additional family members and neighbors whom counsel could have contacted." Id.

King's claim fails because the state habeas court did not base its decision at issue on this factual finding. The factual finding at issue is whether the DFACS records were cumulative and aggravating. This factual finding, however, was only made in relation to the *prejudice* prong of this ineffective assistance of counsel claim. To begin, the state habeas court couched its

discussion of the DFACS records in relation to the broader idea of ineffectiveness, which encapsulates both of Strickland's prongs—i.e., deficient performance and prejudice. See id. at 14 ("[King] now alleges that trial counsel were *ineffective* for failing to obtain DFACS records regarding [King's] family." (emphasis added)). While the state habeas court did not explicitly link this factual finding to either of the two prongs, the factual finding that the DFACS records were cumulative and aggravating only makes sense in relation to the *prejudice* prong. A trial counsel's *performance* is not any less deficient by failing to obtain records that should obviously be obtained—even if those records turn out to be worthless. Nevertheless, such worthless records would not lead to a finding of ineffectiveness because the *prejudice* prong would bar such a finding. Thus, if the state habeas court's finding that the DFACS records were both cumulative and aggravating was correct, then the state habeas court's holding that trial counsel were not ineffective (because King was not prejudiced) would also be correct. Nevertheless, the Court need not reach that issue because the state habeas court found that King's trial counsel did not *perform* deficiently in their mitigation investigation; thus, fatally to this claim, the state habeas court's decision of no deficient performance is not based on the factual finding that the DFACS records were cumulative and aggravating.

Turning to the deficient performance prong, the state habeas court found that King's trial counsel did not perform deficiently in their investigation of mitigating evidence. Regarding the investigation of mitigating records, such as the DFACS records, the state habeas court found that King's trial counsel were not deficient. Looking through the lens of "doubly deferential" review of trial counsels' mitigation investigation, King has not met his burden under 28 U.S.C. § 2254(d). See Yarborough, 540 U.S. at 6 ("Judicial review of a defense attorney's [performance] is therefore highly deferential-and doubly deferential when it is conducted through the lens of federal habeas.").

"To determine whether 'trial counsel should have done something more' in their investigation, 'we first look at what the lawyer[s] did in fact.'" Raulerson, 2019 WL 2710051, at *5 (quoting Grayson, 257 F.3d at 1219) (alteration in original). The state habeas court found that King's trial counsel attended numerous seminars on mitigation, "consulted with a number of mitigation workers including Pamela Leonard, Michael Mears and Stephen Bright," dkt. no. 25-3 at 35 (internal quotation marks omitted), interviewed anybody they could find with information about King, tried to interview King's family members, foster mother, probation officer and teachers, and obtained juvenile records, school records, Wayne County Jail records, Appling General Hospital records, South Georgia Medical Associates

records, youth detention center records, Baxley Wilderness Institute records, Pineland Mental Health/Mental Retardation Services records, Central State Hospital records, and Gateway Center records. See id. at 12, 35. Additionally, King's trial counsel requested records from Tidelands Community Mental Health Center and from the Social Security Administration. Id. at 12-13. The state habeas court also recognized that King's trial counsel had much difficulty locating potential mitigating witnesses because King and his family members "did not direct counsel to these types of potential witnesses." Id. at 36. Notably, King does not challenge these factual findings, which are presumed correct. Based on these factual findings that show an extensive investigation, the state habeas court's decision that King's trial counsels' investigation was constitutionally adequate was reasonable—especially considering that the DFACS records at issue were not King's file but were cases where his mother, father, and brother were the clients. Dkt. No. 21-1 at 2-20.

**I. Trial Counsel Failed to Use Mental Health Experts to Explain in Mitigation King's Traumatic Upbringing, Intellectual Impairment, and Psychotic Illness**

Finally, King claims that his trial counsel were deficient in their presentation of King's mental impairments in conjunction with his traumatic upbringing. King argues that his trial counsel should have utilized King's mental health experts to effectively

present mitigating evidence of his mental impairments that were amplified and caused by his traumatic childhood. King argues that his trial counsel instead had the mental health experts focus solely on the issue of King's intellectual impairment. Further, King argues that "had counsel conducted a competent investigation and effectively marshaled and used the readily available life history and mental health related evidence . . . [they] could have firmly rebutted or even prevented malingering from becoming such a devastating issue at trial." Dkt. No. 65 at 312. This would, in turn, have alleviated Jackson's concerns over recalling Dr. Dickinson and Dr. Miller at the sentencing phase. See Dkt. No. 19-40 at 117 ("I could have put Dickinson and Miller back up but, once again, the jury has already seen them, they've already heard them, they've already decided what they're saying is not the truth.").

As an initial matter, the Court has already determined that the state habeas court's decisions regarding the investigation and presentation of King's mental health—including rebutting the malingering argument—were not unreasonable. Consequently, King cannot rely on that argument here. The issue, then, becomes whether the state habeas court's decision—that King "failed to prove that trial counsel were deficient in not presenting additional expert mental health testimony, or further utilizing the mental health records in their possession," dkt. no. 25-3 at

AO 72A
(Rev. 8/82)

70—was reasonable.  King has not met his burden of showing that it was not reasonable.

King's main argument is not that King's trial counsel failed to elicit mitigating evidence regarding King's mental impairments from King's mental health experts; rather, King argues that his trial counsel failed to elicit the right type of mental health evidence from his experts.  King argues that it was unreasonable and deficient performance for his trial counsel to not have had his experts connect King's traumatic life history to King's mental health.  The state habeas court rejected these arguments and determined that "it was reasonable that trial counsel, after having [King] examined by numerous mental health professionals, rel[ied] on their experts to provide them with an accurate assessment of [King]." Dkt. No. 25-3 at 69.  The Court further noted that "each of the experts' diagnoses were consistent, giving even less reason for trial counsel to question their own experts' conclusions." Id.

King, however, implicitly argues that the state habeas court missed the point: the point is not that King's trial counsel relied on his experts' testimony, but that King's trial counsel did not elicit additional mitigating evidence from his experts.  King goes so far as to show that his trial counsel even ignored such evidence when it was provided by Dr. Miller in a letter to counsel.  See

Dkt. No. 20-1 at 72 (Dr. Miller stated in his affidavit, "I did indicate to counsel in a letter dated August 28, 1998, that [King] had numerous deficits in areas such as abstract reasoning, social judgment and comprehension. In other words, he had significant deficits in his ability to cope with daily life.").

King's arguments fail, however, because he does not show that the state habeas court's decision was unreasonable under 28 U.S.C. § 2254(d)(1) or (d)(2). Specifically, King does not point to a single unreasonable determination of fact in relation to this claim. Indeed, the record shows that Dr. Dickinson and Dr. Miller testified as to King's adaptive behavior, which is one of the components of an intellectual disability. Further, King's citations to clearly established federal law do not show that the state habeas court unreasonably applied clearly established federal law. For example, in Ferrell v. Hall,

> [n]either the jury nor the sentencing judge was ever told, because defense counsel never discovered that Ferrell suffers from extensive, disabling mental health problems and diseases including organic brain damage to the frontal lobe, bipolar disorder, and temporal lobe epilepsy. Nor did they learn that the defendant had attempted suicide at age eleven, or that because of these mental health issues, Ferrell exhibits increased impulsivity and decreased sound judgment; that his conduct was not entirely volitional; or that his judgment and mental flexibility were significantly impaired by organic brain damage. Nor, finally were they ever told that Ferrell's father was physically abusive to his children, especially to Ferrell, waking them in the middle of the night to beat them (sometimes after stripping them naked) with razor strops, fan belts, and old used belts; that the family was repeatedly

evicted from their homes and hungry, and lived in fear of those to whom the father owed gambling debts; or that Ferrell's mother suffered from clinical depression, suicidal ideations, rage blackouts, and urges to physically injure her children.

640 F.3d 1199, 1203 (11th Cir. 2011). Regarding Ferrell's mental health investigation, the Eleventh Circuit found trial counsel's performance deficient with regard to the only mental health expert he had at trial.

Notably, Allsopp [the petitioner's mental health expert] had *not* been asked to look for evidence of brain damage, was provided *no* material from counsel other than school records, and was *not* asked to perform a clinical interview, or do anything else for possible use in mitigation. In fact, Allsopp's marching orders focused only on Ferrell's [the petitioner] ability to interact with the police; counsel did not ask, nor did Allsopp look for whether Ferrell had any mental illness that may have affected him during the crime. Counsel's use of Allsopp was unreasonably constricted in this case because of the wide range of mental health issues other than retardation and competency that could have been relevant (and were relevant) to Ferrell's mitigation investigation, *and* the many red flags that had been raised about Ferrell's mental health throughout the proceeding.

640 F.3d at 1227. Here, King's trial counsel provided his mental health experts with numerous and thorough records, and they sought help from four experts on the issue of not just intellectual disability but, more broadly, mental illness. In short, <u>Ferrell</u>

is distinguishable with respect to the mental health investigations at issue.[9]

King's remaining case cites are inapposite. King's citation to Williams v. Taylor involved the prejudice prong of Strickland and found that the state habeas court failed to take into account mitigating evidence when undertaking the prejudice inquiry. See Williams v. Taylor, 529 U.S. 362, 397-98 (2000) (finding that "the State Supreme Court's prejudice determination was unreasonable insofar as it failed to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding-in reweighing it against the evidence in aggravation"). King's citation to Wiggins v. Smith involved a trial counsel's unreasonable decision "to abandon their investigation at an unreasonable juncture." 539 U.S. 510, 527 (2003). Here, King argues that his trial counsel did not present the right kind of evidence via his experts, not that his trial counsel unreasonably abandoned his mental health investigation.

King cannot overcome the doubly deferential review of his trial counsel's performance. This is especially so here, where

---

[9] So is King's citation to Brownlee v. Haley. See Brownlee v. Haley, 306 F.3d 1043, 1070 (11th Cir. 2002) ("Under the facts of this case, we are compelled to conclude that counsel's failure to investigate, obtain, or present *any* mitigating evidence to the jury, let alone the powerful mitigating evidence of Brownlee's borderline mental retardation, psychiatric disorders, and history of drug and alcohol abuse, undermines our confidence in Brownlee's death sentence.").

all four of King's mental health experts found some evidence of malingering. King "must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, 466 U.S. at 689 (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). The state habeas court reasonably determined that King's trial counsels' challenged actions of focusing their mental health experts on the intellectual disability defense and on not recalling Dr. Dickinson and Dr. Miller during the sentencing phase fell "within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689. After all, "[i]t is '[r]are' that constitutionally competent representation will require 'any one technique or approach,'" Cullen v. Pinholster, 563 U.S. 170, 195 (2011) (second alteration in original) (quoting Richter, 562 U.S. at 106), which King seems to advocate for in this claim.

## II. Georgia's Reasonable Doubt Standard for Determining Mental Retardation (Claim Two)

When King was tried in 1998, Georgia law required that a defendant claiming that he was intellectually disabled (then the term used was "mentally retarded") must prove such disability to the jury beyond a reasonable doubt. See O.C.G.A. § 17-7-131(c)(3) (1998). On direct appeal, the Georgia Supreme Court rejected King's challenge to the constitutionality of Georgia's beyond-a-

reasonable-doubt standard. <u>King</u>, 539 S.E.2d at 798. King's claims that the standard violates both the Eighth and Fourteenth Amendments have been rejected by the Eleventh Circuit. Because the Court is bound by the holdings in published decisions of the Eleventh Circuit, it must deny King's petition with respect to these claims. See <u>Raulerson</u>, 2019 WL 2710051, at *9 ("According to [the petitioner], the Supreme Court's holdings in <u>Atkins</u> and <u>Cooper</u> clearly establish that the application of Georgia's beyond-a-reasonable-doubt standard to his claim of intellectual disability violated his right to due process under the Fourteenth Amendment by failing to protect his Eighth Amendment right not to be executed if intellectually disabled. Because neither <u>Atkins</u> nor <u>Cooper</u> so held, this argument fails."). The Court also rejects the remaining claims King sets forth in Claim Two of his petition because they were not briefed, and thus King cannot satisfy his burden.

## III. Whether King's Death Penalty is Disproportionate Punishment (Claim Four)

In Claim Four, King argues that his rights were violated when the Georgia Supreme Court failed to properly conduct a proportionality review of King's death penalty as required by state law. The Georgia Supreme Court found that King's sentence "was neither excessive nor disproportionate to the penalties imposed in similar cases in this State." <u>King</u>, 539 S.E.2d at 802 (citing

O.C.G.A. § 17-10-35(c)(3)). The Georgia Supreme Court cited to O.C.G.A. § 17-10-35(c)(3), which required it to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant."

Even if the Georgia Supreme Court's proportionality reviews of King and other cases have become "perfunctory" as King argues, the United States Supreme Court has concluded that proportionality review is not required by the Constitution "where the statutory procedures adequately channel the sentencer's discretion." McCleskey v. Kemp, 481 U.S. 279, 306 (1987) (citing Pulley v. Harris, 465 U.S. 37, 50-51 (1984)). Georgia's statutory procedures have been found adequate. See Collins v. Francis, 728 F.2d 1322, 1343 (11th Cir. 1984) ("[I]t appears clear that the Georgia [death penalty] system contains adequate checks on arbitrariness to pass muster without proportionality review." (internal quotations and citations omitted)); see also Walker v. Georgia, 555 U.S. 979, 987 (2008) ("Proportionality review is not constitutionally required in any form. Georgia simply has elected, as a matter of state law, to provide an additional protection for capital defendants." (Thomas, J., concurring in the denial of cert.) (citing Pulley, 465 U.S. at 45)).

AO 72A
(Rev. 8/82)

In essence, King is challenging the Georgia Supreme Court's alleged failure to properly carry out its *statutory* duties and argues that this Court should disagree with the Georgia Supreme Court's findings that were reached in undertaking those duties. Such challenges, however, are not proper under 28 U.S.C. § 2254. See Mills v. Singletary, 161 F.3d 1273, 1282 n.9 (11th Cir. 1998) ("[A] federal habeas court should not undertake a review of the state supreme court's proportionality review . . . It is the state's responsibility to determine the procedure to be used, if any, in sentencing a criminal to death." (quoting Moore v. Balkcom, 716 F.2d 1511, 1518 (11th Cir. 1983))); Lindsey v. Smith, 820 F.2d 1137, 1154 (11th Cir. 1987) ("[W]e refuse to mandate as a matter of federal constitutional law that where, as here, state law requires [proportionality] review, courts must make an explicit, detailed account of their comparisons."). Accordingly, King fails to state a claim for federal habeas corpus relief with respect to Claim Four.

## IV. **Batson** and **J.E.B.** Claims (Claim Five)

### A. The **Batson** and **J.E.B.** Framework

"It is clearly established federal law that, under the Equal Protection Clause, a criminal defendant has a constitutional 'right to be tried by a jury whose members are selected pursuant to nondiscriminatory criteria.'" Adkins v. Warden, 710 F.3d 1241,

AO 72A
(Rev. 8/82)

1250 (11th Cir. 2013) (quoting <u>Batson v. Kentucky</u>, 476 U.S. 79,

85-86 (1986)). A violation of the Equal Protection Clause based

on the State's striking of jurors has been coined a <u>Batson</u>

violation.[10]    When determining whether such a violation has

occurred, courts undertake a three-step process:

> First, the defendant must make out a prima facie case by
> showing that the totality of the relevant facts gives
> rise to an inference of discriminatory purpose. Second,
> once the defendant has made out a prima facie case, the
> burden shifts to the State to explain adequately the
> racial [or gender] exclusion by offering permissible
> race-neutral [or gender-neutral] justifications for the
> strikes. Third, if a race-neutral [or gender-neutral]
> explanation is tendered, the trial court must then
> decide . . . whether the opponent of the strike has
> proved purposeful racial [or gender] discrimination.

<u>Madison v. Comm'r</u>, 677 F.3d 1333, 1337 (11th Cir. 2012) (quoting

<u>Johnson v. California</u>, 545 U.S. 162, 168 (2005)).[11]

Neither party disputes that Petitioner established a *prima*

*facie* case of purposeful discrimination or that the state proffered

race-neutral and gender-neutral reasons for striking the jurors at

issue. Thus, the Court focuses on <u>Batson</u>'s third step.

Regarding the third step, "it is a defendant's burden to prove

purposeful discrimination."    <u>Adkins</u>, 710 F.3d at 1250.    When

---

[10] For simplicity's sake, even though King is arguing that the prosecution violated both <u>Batson</u> and <u>J.E.B.</u>, the Court will refer to these claims as arising under <u>Batson</u>—i.e., a <u>Batson</u> claim or challenge. See <u>J.E.B. v. Alabama ex rel T.B.</u>, 511 U.S. 127, 144-45 (1994) (holding that <u>Batson</u>'s prohibition on racially discriminatory strikes applies to gender-based discriminatory strikes).
[11] The <u>Batson</u> three-step process also applies to allegations of gender-based discrimination. See <u>J.E.B.</u>, 511 U.S. at 144-45.

AO 72A
(Rev. 8/82)

determining whether the defendant has met this burden, "the trial court should *consider all relevant circumstances*." Id. (quoting Batson, 476 U.S. at 96). Along this line, "a court must undertake a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." Batson, 476 U.S. at 93 (internal quotation marks and citation omitted). "[A] state court's failure to consider 'all relevant circumstances' at Batson's third step is an unreasonable application of Batson under § 2254(d)(1)." Adkins, 710 F.3d at 1251 (citing McGahee v. Ala. Dep't Of Corr., 560 F.3d 1252, 1261-62 (11th Cir. 2009)).

## B. **Batson**, **J.E.B.**, and AEDPA

It is well-established that a state court's "evaluation of a prosecutor's race-neutral or gender-neutral explanation for a strike under Batson is a 'pure issue of fact . . . peculiarly within a trial judge's province.'" Smith v. Comm'r, Ala. Dep't of Corr., 924 F.3d 1330, 1344 (11th Cir. 2019) (quoting McNair v. Campbell, 416 F.3d 1291, 1310 (11th Cir. 2005)). Because the Court is thus reviewing a factual finding through the lens of AEDPA, "[King] may obtain relief only by showing the [Georgia] conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'" Miller-El v. Dretke, 545 U.S. 231, 240 (2005) (quoting 28 U.S.C. § 2254(d)(2)). Thus, "[t]o succeed under § 2254(d)(2), [King] must show that it

was unreasonable for the state court to credit the prosecutor's proffered explanations for the strikes." Smith, 924 F.3d at 1346. Finally, because the issue is a factual one, and because factual findings are presumed correct on federal habeas corpus review, King "bears the burden of rebutting that presumption by 'clear and convincing evidence.'" Id. at 1345 (quoting 28 U.S.C. § 2254 (e)(1)).

### C. Whether King is Entitled to *De Novo* Review Under 28 U.S.C. § 2254(d)(1)

Before reaching the factual determinations at issue, King first attempts to proceed under § 2254(d)(1). If successful, King would be entitled to *de novo* review of his Batson claims that are properly before the Court. See Johnson, 615 F.3d at 1329-30 ("However, where the petitioner makes the required § 2254(d) showing as to a state court decision, we owe no AEDPA deference to that decision and instead review the claim *de novo*."). King argues that "the Georgia courts unreasonably misapplied Batson's step-three analysis and reached unreasonably wrong determinations of fact as a result." Dkt. No. 65 at 71. King argues Batson was unreasonably applied because its third step requires courts to consider "all relevant circumstances." Batson, 476 U.S. at 96. King argues that the Georgia Supreme Court, sitting in review on direct appeal of the trial court, unreasonably failed to take into account the following circumstances: (1) that the trial court

discredited the prosecutor's race-neutral explanation regarding Juror Jacqueline Alderman; (2) that the trial court found that the prosecutor's strike of Alderman was purposeful discrimination; (3) the strong statistical discrimination in this case; (4) the prosecutor's outrage when the trial court found a *prima facie* case of discrimination; (5) "the prosecutor's inappropriate amusement at the challenge to his strike of Barbara Dean," dkt. no. 65 at 78; (6) the prosecutor's "intemperate, racially charged attack on Batson when the trial court found he had purposefully discriminated in striking Jacqueline Alderman," id.; and (7) that King was charged with killing a white woman.

King relies on McGahee to establish that the Georgia Supreme Court unreasonably applied Batson by not considering all relevant circumstances. To the extent King argues McGahee stands for the proposition that a court must *discuss in its opinion* every relevant circumstance in order to satisfy Batson's third-step, King is incorrect. The Eleventh Circuit has clarified McGahee's holding and has found that McGahee does not hold "that AEDPA deference does not apply to state court decisions accompanied by opinions that do not discuss all the evidence, circumstances, or arguments." Lee v. Comm'r, Ala. Dep't of Corr., 726 F.3d 1172, 1214 (11th Cir. 2013). Indeed, "[u]nder Supreme Court and [Eleventh] Circuit precedent, a state court's written opinion is not required to

mention every relevant fact or argument in order for AEDPA deference to apply." Id. at 1223.

Looking at the first alleged error, King argues that the Supreme Court of Georgia unreasonably applied Batson by "unreasonably transform[ing] the trial court's finding of intentional discrimination with respect to the strike of Juror Alderman into an innocuous event to which it gave no consideration." Dkt. No. 65 at 75. King goes on to argue that "in finding a Batson violation, the trial court in fact found that the defense had proven purposeful discrimination and that the prosecutor had been untruthful in claiming he had struck this juror for reasons other than her race and/or gender." Id. at 76. Looking at the trial court record, the trial court discounted the prosecutor's race-neutral explanation as not being consistent with the record. The trial court then found Alderman "to have been an improper strike." Dkt. No. 16-28 at 54. The trial court did not explain its decision in terms of the Batson framework, but it was not unreasonable for the Georgia Supreme Court to ground the trial court's decision in Batson's second step: that the trial court found that the prosecutor did not adequately explain Alderman's exclusion with a permissible race-neutral justification. In other words, it was not unreasonable for the Georgia Supreme Court to find that the trial court held that the race-neutral reason given by the prosecution was inadequate. Nevertheless, however the trial

court's finding is couched, the Georgia Supreme Court's discussion of Alderman shows that it was aware that the trial court found that the prosecutor's reasons for striking Alderman were discredited by the trial court and that the prosecutor's strike violated Batson. Thus, King has not met his burden of showing that the Georgia Supreme Court did not take this circumstance into account.

Regarding the other circumstances, with the exception of statistical evidence (which is discussed next), King has not shown that the Georgia Supreme Court did not take these circumstances into account. Again, the Georgia Supreme Court was not required to discuss *or even mention* these circumstances. Further, McGahee does not control because this case is not like McGahee. There, after a Batson objection in the state trial court, the prosecution gave only general explanations for striking only black venire members (except in the case of one venireman). McGahee 560 F.3d at 1258. The trial court, however, still denied the Batson challenge. Id. at 1259. After the verdict, the prosecution gave "individualized, specific reasons for its peremptory strikes," but the state trial court never ruled on any of them. Id. at 1259-60. While the prosecution gave three reasons for striking one of the veniremen, the state appeals court never addressed one of the reasons, which was an "explicitly racial reason for striking" the veniremen. Id. at 1264. The McGahee court concluded that the

AO 72A
(Rev. 8/82)

state appeals court "clearly limited its review to only . . . two reasons *and did not implicitly review any other reasons.*" Id. (emphasis added). Thus, the McGahee court explicitly recognized that a court may properly implicitly review circumstances (and thus need not discuss or mention those circumstances). That did not occur in McGahee: that court found that the state court *did not* consider an explicitly racial reason, which was in contravention of Batson. King, however, has pointed to no evidence that the Georgia Supreme Court failed to consider the circumstances listed above—other than the fact that the Georgia Supreme Court did not mention these circumstances: such evidence is insufficient to show an unreasonable application of Batson's third step. See Greene v. Upton, 644 F.3d 1145, 1155 (11th Cir. 2011) ("[The petitioner] relies on our decision in McGahee, 560 F.3d 1252, to argue that the Supreme Court of Georgia applied Batson unreasonably because it did not explicitly discuss each reason offered by the state in support of the peremptory challenges, but McGahee does not stand for that proposition.").

Turning to the statistical evidence in this case, McGahee is also distinguishable even though it dealt with a similar issue. McGahee found that the state appellate court unreasonably applied Batson because it "failed to consider the fact that 100% of the African-American potential jurors were removed from the jury by the State." Id. at 1265. The state appellate court unreasonably

applied <u>Batson</u> because although it "noted that '[t]he State used sixteen of its twenty-two strikes to exclude all of the black venire members from the jury,' the court never discussed the fact that all of the black venire members had been removed by the prosecution through the challenges for cause and peremptory challenges, and never discussed this pattern or the significance thereof." <u>Id.</u> (quoting <u>McGahee v. State</u>, 554 So. 2d 454, 459 (Ala. Crim. App. 1989), <u>aff'd,</u> 554 So. 2d 473 (Ala. 1989)). Thus, it was the fact that the state court noted this disparity without giving it any weight that made that court's analysis unreasonable. Here, however, the Georgia Supreme Court did not misstate the extent of the exclusion of black venire members. Rather, the Georgia Supreme Court did not discuss this circumstance. The Court cannot say, based solely on the Georgia Supreme Court's lack of discussion of this circumstance, that the Georgia Supreme Court unreasonably applied <u>Batson</u>. Rather, the Court begins with the presumption that the Georgia Supreme Court reasonably applied <u>Batson</u> by taking into account the statistical evidence. Thus, the Court presumes that even taking into account this circumstance (and the others listed above) the Georgia Supreme Court still found that King could not satisfy his burden. Whether this factual finding by the Georgia Supreme Court is unreasonable will be discussed below. <u>See</u> <u>infra</u> Part IV.G.

AO 72A
(Rev. 8/82)

For these reasons, King is not entitled to *de novo* review of his Batson claims under 28 U.S.C. § 2254(d)(1).

## D. Trial Judge's Application of Batson and J.E.B.

This section gives the factual background on the jury selection process that occurred at King's trial. After taking roll call and swearing in the potential jurors, the trial judge instructed the venire on the procedures by which the petit jury would be chosen. Dkt. No. 16-10 at 35-36. The judge explained that the 168 potential jurors[12] were to be divided into jury panels,[13] that each panel would be questioned separately, and that each juror would then be further separated and questioned individually. Id. at 35-36. The trial judge also introduced the parties. Id. at 37. Assistant District Attorney John Johnson represented the State. Id. G. Terry Jackson was lead counsel for the defense; he represented King along with his co-counsels George Hagood, Patty Williams, and Steven Sparger. Id. at 37-38. After more preliminary instructions, the judge placed the potential jurors into panels, told each panel when they would likely need to return to the courthouse for voir dire, and then excused the panels. Id. at 35-95.

---

[12] See Dkt. No. 16-10 at 29 (calling Juror 168).
[13] A total of 12 panels were created. See Dkt. No. 16-10 at 95 (excusing Panel 12).

AO 72A
(Rev. 8/82)

The actual voir dire—the questioning of the venire members—occurred over the next week. The process was for each panel, moving sequentially from Panel 1, to be seated in the jury box as a group. The trial judge would then ask a series of questions to the entire panel (titled "General Exam" in the transcripts) and the venire members would raise their hands to signify an answer in the affirmative; after the court's inquiries, the prosecutor and then the defense were each given the same opportunity to ask questions to the whole panel whereby a panel member would raise his or her hand in the affirmative, with some follow up questions at times. See e.g., dkt. no. 16-13 at 14-42 (questioning Panel 1 in this manner). After the entire panel was questioned, the panel was removed to the jury room, and an individual venire member was retrieved. The potential juror would then be questioned by the trial judge, then the prosecutor, and finally the defense. Throughout the process, potential jurors were excused for various reasons.

After fifty-four potential jurors were qualified (with Panel 6 being the final panel questioned), that portion of the process was complete, and the striking portion began the following Monday. See Dkt. No. 16-26 at 157; Dkt. No. 16-28 at 12. At the time of trial, Georgia law provided that the state had ten peremptory strikes and the defense had twenty. See O.C.G.A. § 15-12-165 (1994) ("[I]n any case in which the state announces its intention

AO 72A
(Rev. 8/82)

to seek the death penalty, the person indicted for the crime may peremptorily challenge 20 jurors and the state shall be allowed one-half the number of peremptory challenges allowed to the accused."). Further, out of the fifty-four potential jurors selected, three groups of four were created by which three alternates would be selected (the state having one strike from each group and the defense having two). See O.C.G.A. § 15-12-169 (1994) ("The defendant shall be entitled to as many peremptory challenges in an amount twice greater than the additional peremptory challenges of the state."). Deducing from the clerk's copy of the strike list and the transcript, the Court finds that the striking process was as follows: the first potential juror would stand; the State would then mark either "excuse" or "accept" on the strike sheet; "excuse" meant that person was struck; if the State marked "accept," then the defense was given the option to either mark "excuse" and strike that person or mark "accept" and have that person become a member of the petit jury. Dkt. No. 14-21 at 58-60; Dkt. No. 16-28 at 12-14.

After the striking process was completed, the lead defense counsel, Jackson, made a Batson objection to the State's strikes. Dkt. No. 16-28 at 17. Jackson argued his *prima facie* case, explaining that "[i]n the main panel, there were eight black jurors," that "[t]he State struck seven of those," who were all females, and that the State used only one of its four available

strikes for the alternates, which was to strike a black female. Id. The Court found that the defense had satisfied its burden of making a *prima facie* case of discriminatory intent. Id. at 18. The burden then shifted to the State to explain permissible neutral justifications for its strikes, which the prosecutor did for each of his ten peremptory strikes and his alternate strike. Id. at 20-29.

After the State set forth its non-discriminatory justifications for its strikes, the trial court turned to the defense to rebut such bases and to prove that the prosecution was motivated in substantial part by discriminatory intent. After each rebuttal argument, the Court would make its decision (with two exceptions) as to whether the defense satisfied its burden. After discussing Jacqueline Alderman, however, the trial judge reserved its ruling, stating that he would come back to that challenge. Id. at 32. Likewise, with Alnorris Butler, the trial judge again did not rule right away. See id. at 35. Nevertheless, with the rest of the jurors, the trial court found that the defense had not met its burden of proving purposeful discrimination. Retuning to Alderman and Butler, the trial court found that the defense did not meet its burden as to Butler. Id. at 51-52. As to Alderman, the trial court found a Batson violation. Id. at 54.

Having found that the strike of Alderman violated Batson, the Court ordered that the jury be re-struck—an order that angered the prosecutor. The exchange began:

> Johnson: -- why should we do that? Why not just -- I mean I don't have -- first of all, I have a problem that if I say, find out that somebody knows the family and I can't -- excuse me - give me a moment.

> The Court: Calm down. Get yourself, your thoughts proper and then tell me what you want to tell me.

Id. at 55. Johnson then elaborated on his position, which is reproduced in its entirety so as to not take any portion of it out of context:

> I find it improper for this Court to tell me that I cannot decide, when I listen to what somebody says and look at them, that they know the family, that they've been living in this community for 35 years, that that's not a justifiable strike. If that's the case, then 90 percent of the strikes that I've taken, and 100 percent of the strikes the defense takes in a case are irrelevant.

> If this lady were a white lady there would not be a reason -- there would not be a question in this case. And that's the problem I have with all of this is that it's not racially neutral. There was a time when it was racially neutral and that was before Batson. Because I had to act that way when I was in Brunswick because it was a physical impossibility if you wanted to strike every black off a jury for you to do that. And we had an issue just -- you had to reform your whole ideas and then Batson came out. And Batson now makes us look whether people are black or not. Not whether they're black or white, but black or not. And I may be arguing for the Supreme Court in this particular case and not for this court, which I probably am, but it just, it is

AO 72A
(Rev. 8/82)

uncalled for to require people to be reseated on a jury
that I have a problem with in this case.

This lady sits on this jury and all of a sudden out
comes the fact that back during the life of this man's
mother and father they were alcoholics, they beat him,
or they ignored him, or they -- and she sits there and
says well I remember that. Then I'm screwed, to use the
vernacular. Not because I know that's what's going to
happen because my experience is anyone who knows the
family and has that much time involved in the community,
those are the people that hang up a jury. That's my
experience. And when I base it on my experience and
then this Court says that's not a good enough reason,
then I take issue with this entire whole process, both
to this Court and to the Supreme Court of Georgia. It's
improper and it's wrong.

What I would suggest this Court to do now that I've
had my say, and I'm sorry, I'm very angry right now.

_Id._ at 55-56. After Johnson's soliloquy, the defense, the

prosecutor, and the Court agreed that the proper remedy was to

reseat Ms. Alderman on the jury. _Id._ at 56-60. The previous

twelfth juror was removed from the jury to make room for Ms.

Alderman. _Id._ The jury process was then complete.

### E. The Georgia Courts' Rulings

Following his conviction and sentence of death, King filed a

motion for new trial and then an amended motion for new trial.

Dkt. No. 14-22 at 22-24, 52-70. In the amended motion, King

argued, among other things, that the trial court violated King's

due process and equal protection rights by "allowing the prosecutor

to run criminal history checks on family members of Afro-American

AO 72A
(Rev. 8/82)

jurors, while not running similar checks on family members of white jurors." Id. at 59. King further argued that the trial court erred in not granting his Batson challenges on racial and gender grounds as to Barbara Dean, Alnorris Butler, Peggy Tillman, Maurice Vann, Patricia McTier, Jane Ford, Vondola Barney, Lillie Burkett, and Gwen Gillis. Id. at 60. The trial court summarily denied the motion. Id. at 82.

On direct appeal to the Georgia Supreme Court of the trial court's denial on his motion for new trial, King again argued that the trial court erred in finding that there was no Batson violation; this time, however, King also identified Juror Sarah McCall as having been unlawfully struck, in addition to Jurors Burkett, Vann, Dean, Ford, and Gillis. Dkt. No. 18-8 at 35-61. King did not expressly challenge the strikes of Butler, Tillman, McTier, and Barney, as he had in his motion before the trial court.[14] The Georgia Supreme Court held that the trial court did not abuse its discretion in finding no discrimination with respect to Jurors Burkett, Vann, McCall, Dean, Ford, and Gillis. King v. State, 539 S.E.2d 783, 795-96 (Ga. 2000).

---

[14] In his appeal, King did mention, in passing, the strikes of Butler and Barney as part of his argument with regard to Burkett. Id. at 44-45. However, he did not expressly identify those jurors as part of his challenge on appeal.

AO 72A
(Rev. 8/82)

King's next bite at the apple was his petition for a writ of habeas corpus with the state habeas court.[15] There, King—in his amended petition—again challenged the prosecutors strikes, but King did not specify which strikes he was challenging. King, however, included a footnote to his claim stating: "To the extent trial counsel failed adequately to raise and litigate this issue at trial or on appeal, counsel was ineffective, and Petitioner was prejudiced thereby." Dkt. No. 19-35 at 30 n.9. In King's post-hearing brief in support of his petition, however, King did not argue his Batson or J.E.B. claim. Dkt. Nos. 24-28, 24-29. Rather, the brief was entirely silent on the issue. Likewise, King's proposed order filed in the state habeas court did not include any findings of fact or conclusions of law with respect to his Batson or J.E.B. claims. Dkt. Nos. 25-1, 25-2. The state habeas court did find, however, that King's Batson and J.E.B. claims were barred by the doctrine of res judicata because "the claims were raised and litigated adversely to [King] on his direct appeal to the Georgia Supreme Court." Dkt. No. 25-3 at 2; see also id. at 3 (finding barred by res judicata "[t]hat portion of Claim V, wherein [King] alleges that the prosecution improperly used its peremptory strikes to systematically exclude unspecified jurors on the basis of race and/or gender"). Finally, King's application to the

---

[15] King did petition the United State Supreme Court for a writ of certiorari, but the petition was summarily denied. King v. Georgia, 536 U.S. 957 (2002).

Georgia Supreme Court for a certificate of probable cause to appeal was summarily denied. Dkt. No. 25-10.

### F. Procedural Default of This Claim with Respect to Juror Patricia McTier

Under AEDPA, a federal habeas petition must first have "exhausted the remedies available in the courts of the State," before he or she may apply for a writ of habeas corpus. 28 U.S.C. § 2254(b)(1)(A). Here, on direct appeal of his conviction to the Georgia Supreme Court, King never challenged the trial court's denial of his _Batson_ challenge as to Juror Patricia McTier. King agrees that his "[a]ppellate counsel did not specifically challenge the removal of Ms. McTier in Mr. King's direct appeal." Dkt. No. 65 at 87 n.37.

Even though this claim was not exhausted within the meaning of AEDPA, the Court may still consider it if King properly challenged his appellate counsels' failure to appeal this claim in the state habeas court under a theory of ineffective assistance of counsel. If King had, then King would have been on the path of properly exhausting, within the meaning of § 2254(b)(1)(A), the ineffective assistance of counsel claim. But, King did not, so any claim that his counsel on direct appeal was ineffective must

AO 72A
(Rev. 8/82)

also fail per failure to exhaust.[16]  See Fults v. GDCP Warden, 764 F.3d 1311, 1317-18 (11th Cir. 2014) ("[A] cause and prejudice argument which is not presented in state court is itself procedurally defaulted and cannot be raised for the first time on federal habeas (unless, of course, there is cause and prejudice for that particular default as well)."  (citing Henderson v. Campbell, 353 F.3d 880, 895-99 (11th Cir. 2003))).

## G. The Remaining Batson and J.E.B. Claims

### 1. Overarching Relevant Circumstances

King argues that statistical evidence supports a finding that the prosecution's strikes were motivated in substantial part by discriminatory intent.  King's trial counsel established a *prima facie* violation of Batson by pointing to the racial disparity in the prosecution's strikes.  The defense argued that of the eight black jurors in the main panel, the prosecution used seven of its ten strikes to strike black females.  Dkt. No. 16-28 at 17.[17]  The defense also noted that of the alternates, the prosecution struck one potential alternate, who was black.  Id. at 18.  These facts are indeed evidence suggesting racial discrimination that this

---

[16] King's argument that the State waived these procedural defaults is nonsensical because King never raised a Batson claim with respect to McTier in his amended state habeas petition.  Indeed, the amended petition never even mentions McTier— let alone a Batson claim or an ineffective assistance of counsel claim grounded in the removal of McTier.  See Dkt. No. 19-35.

[17] This is not accurate: two of the seven strikes were against black males, Maurice Vann and Alnorris Butler.

Court must take into account. See Miller-El v. Cockrell, 537 U.S. 322, 342, (2003) (finding that "the statistical evidence alone raises some debate as to whether the prosecution acted with a race-based reason," where the prosecution struck "91%" of the eligible black venire members with 10 of their 14 peremptory strikes); Batson, 476 U.S. at 97 (finding that a "'pattern' of strikes against black jurors included in the particular venire might give rise to an inference of discrimination").

Further, the Court must take into consideration the trial court's finding that the prosecution violated Batson with its strike of Alderman. The Court must also consider that, in so doing, the trial court discredited the prosecution's explanation for its strike and found it was unconstitutionally based. See Flowers v. Mississippi, 139 S. Ct. 2228, 2243 (2019) (finding that in reviewing Batson challenges defendants may present evidence of a "relevant history of the State's peremptory strikes in past cases").

As to the circumstances of the prosecutor's reactions to the trial court finding a *prima facie* case, to the trial court finding purposeful discrimination on the strike of Ms. Alderman, and to the Batson/J.E.B. challenge of Barbara Dean, the Court notes that "the best evidence of discriminatory intent often will be the demeanor of the attorney who exercises the challenge," and that the

Supreme Court has "recognized that these determinations of credibility and demeanor lie peculiarly within a trial judge's province." Flowers, 139 S. Ct. at 2244 (quoting Snyder v. Louisiana, 552 U.S. 472, 477 (2008)). Nevertheless, the Court will take these circumstances into account—as it must.

Even though the Patricia McTier claim is procedurally defaulted, King argues that the Court must consider the prosecutor's alleged misconduct as a relevant circumstance. First, without any prompting from McTier, the prosecutor asked McTier whether she was "related to Wilma McTier through [her] husband." Dkt. No. 17-1 at 68. McTier confirmed that she was related by marriage to Wilma and then clarified that Wilma was "probably" her husband's "second or third cousin[]." Id. at 68-69. When asked during the Batson inquiry to provide a non-discriminatory reason for striking McTier, the prosecutor stated that his office had prosecuted Wilma McTier for an aggravated assault. Dkt. No. 16-28 at 24. When describing the relationship between Wilma and Patricia McTier, the prosecutor bumbled over its nature: "Wilma McTier is related to Ms. McTier. My understanding was that that was her brother. She indicated it was her husband's – some other relationship. My indication was it was her brother-in-law. She indicated it was like her brother's uncle." Id. The prosecutor then clarified that he looked through the office's records and "determine[d] that we did in fact prosecute Wilma

McTier for aggravated assault." Id. at 24-25. The trial court then told the prosecution that if Wilma was Patricia's brother's uncle, then Wilma would also be Patricia's uncle. Id. at 25. The prosecution again attempted to clarify the relationship: "I'm sorry, no, her husband's uncle. I thought it was her brother-in-law, her husband's brother. She thought it was her husband's uncle." Id. The prosecutor then immediately reiterated that he had "look[ed] that up in our records, and we have prosecuted Wilma McTier. She did acknowledge that they were related." Id.

The defense then requested that the trial court determine whether the prosecution ran searches on all of the black jurors' relatives to determine whether they had been prosecuted by the district attorney's office. The trial judge responded that he thought "as [he] remember[ed] it, that [McTier] almost volunteered this information, I think, from misunderstanding the question that was asked." Id. at 40. The trial court continued, "I think the question was actually asked in another manner, as I'm remembering it, where they were asking -"; at this point the prosecution interrupted and offered, "[a]re you a victim." Id. The exchange that followed is long but is necessarily reproduced in almost its entirety (with a small portion omitted as irrelevant):

> The Court: And I can't remember whether it was the State or the defense that asked it, but somebody asked a question that was actually looking for an opposite answer, --

AO 72A
(Rev. 8/82)

Johnson: Yes, sir, yes, sir.

The Court: -- and I think the jurors misunderstood the question and volunteered that they, a member of their family had been prosecuted or was in custody.

Johnson: As the Court remembers, in individual voir dire-

The Court: Oh, I think it was something, maybe a question, that had been asked on the thing about who - had anybody ever had any problems with law enforcement.

Johnson: No, sir.

The Court: Okay, go ahead.

Johnson: When defense counsel began his individual voir dire, he asked every juror had they ever been a victim of a crime, and what I did was -

The Court: Victim.

Johnson: . . . The question was asked, has any member - you or your immediate family ever been a victim of a crime.

The Court: Then he followed up in his individual and said you said you were a victim of a crime, and Ms. McTier responded to say - I think she misunderstood that, and I think there was one other juror -

Johnson: Ms. Barney

The Court: -- that misunderstood and answered similarly, disclosing that there had been some member of their family that was in fact prosecuted, not a victim, but had been prosecuted.

Jackson: Well, my notes don't reflect that as to this jury, Your Honor.

The Court: Okay. Initially, I find no discrimination there. If I'm going to listen to one, I may listen to that just to be sure, but I'm thinking that that - My memory is that that was a volunteered thing. The state has noted that they have prosecuted a family member, and they have stated that - They have, to be sure, even though they asked the question, have verified that. Go ahead.

AO 72A
(Rev. 8/82)

. . .

> Johnson: Your Honor, if I just can say in response to
> that, regardless of whether it was said or not, I happen
> to know that Wilma McTier was prosecuted by our office.
> Because of the relationship of the names, I had a right
> to ask and did ask are you related to Wilma McTier, and
> she stated her relationship. I happen to know that
> Barbara Dean's stepson was shot by Darren Crosby. I
> don't have to ask them and embarrass them about that
> information. I don't have to go into it. If I know it
> and can reasonably verify it's accurate, I've got a right
> to rely on that no matter what, just like defense counsel
> does.

Id. at 41-43.

The record shows that Patricia McTier did not volunteer any information about Wilma McTier prior to being questioned by Johnson during individual voir dire. Thus, Johnson and the trial court's recollection was incorrect, as was Johnson's representations of the degree of Wilma and Patricia's familial relationship. The prosecution's incorrect recollection of both that Patricia first raised the prospect of Wilma being prosecuted and of the degree of Patricia and Wilma's familial relationship is relevant when determining whether the prosecution's other strikes were "motivated in substantial part by discriminatory intent." Foster v. Chatman, 136 S. Ct. 1737, 1742 (2016) (quoting Snyder, 552 U.S. at 485); see also, Flowers, 139 S. Ct. at 2243 (finding that a defendant can support a Batson challenge with evidence of "a prosecutor's misrepresentations of the record when defending the strikes during the Batson hearing").

All of the circumstances discussed in this section must be considered under Batson's third step. Thus, they will be considered by the Court when determining whether the Georgia Supreme Court's findings were reasonable.

## 2. Sarah McCall

The prosecutor's race-neutral reasons for striking McCall were that the death penalty was "not her first choice," that she "had a lot of hesitancy about her," and that her husband (who was in the venire in a different panel) felt that she was opposed to the death penalty. Dkt. No. 16-28 at 23–24. However, the prosecutor's third reason[18]—that McCall's husband said she was opposed to the death penalty—is contradicted by the record. The exchange was as follows:

> Johnson: Have you and your wife talked about – Well, first let me ask you this. The feelings that you have, are they based on, are they based in part on, your religious principles –
>
> Mr. McCall: Yes.
>
> Johnson: -- about the death penalty.
>
> Mr. McCall: Yes, sir, yes.
>
> Johnson: Okay. Have you and your wife talked about that?

---

[18] The prosecutor explained to the trial court: "I did not make up my mind about Ms. McCall until after we voir-dired her husband, who was Richard McCall and in the next panel. If the Court remembers, I believe I asked him the question, when we were dealing with his death penalty opposition, did he feel his wife was opposed to it also, and he said he thought she would be, and for those reasons, that she is against the death penalty or would not consider it equally, I struck her." Dkt. No. 16-28 at 24.

Mr. McCall: No, sir.

Johnson: So whatever decisions you and she make, you either could have different points of view or the same points of view, but you don't know how she feels about it?

Mr. McCall: Correct.

Johnson: That's all I have, Judge.

Dkt. No. 16-20 at 73-74. This misstatement of the record becomes even more important because the prosecution expressly relied on it to strike McCall: "I did not make up my mind about Ms. McCall until after we voir-dired her husband, who was Richard McCall and in the next panel." Dkt. No. 16-28 at 24. This misstatement of the record can be evidence that the prosecutor was motivated by discriminatory intent. See Flowers, 139 S. Ct. at 2250 ("When a prosecutor misstates the record in explaining a strike, that misstatement can be another clue showing discriminatory intent.").

King argues that even more evidence of discriminatory intent exists because of inconsistent treatment of McCall as compared to "many white prospective jurors whom the prosecutor accepted." Dkt. No. 65 at 82. The first two race-neutral reasons the prosecutor set forth for striking McCall were that "[s]he indicated that the death penalty was not her first choice" and that "[s]he had a lot of hesitancy about her." Dkt. No. 16-28 at 23-24. McCall indeed responded to the trial judge's question of "are you against the death penalty" as follows:

AO 72A
(Rev. 8/82)

"Your Honor, I have questions about that. Because of my religious beliefs, the Bible plainly states that I shall not kill. Okay. If the defendant has killed someone and you in turn, if that defendant is found guilty, then you kill him. I mean I have questions about that, but I really do believe in some cases that the death penalty should be given."

Dkt. No. 17-1 at 44. While McCall did agree that "in some instances" the death penalty "would be an appropriate punishment," she did show some hesitancy in her ability to recommend it: when asked whether, "after considering all of the evidence, that the most appropriate penalty was death, could you recommend to the Court that it impose that sentence," McCall responded "I think I could." Id. at 45-46. When it was the prosecution's turn to question McCall, she continued to show hesitancy toward the death penalty. While she did affirm that she could vote to recommend the death penalty, she also agreed that "because of [her] religion and [her] beliefs" she had problems with the death penalty and that if given other choices of punishment she would "lean toward those other choices before [she] would consider the death penalty." Id. at 50-51.

King's argument—that "McCall's views about the death penalty were no less favorable to the state's interest in a death sentence than those of many white prospective jurors whom the prosecutor accepted," dkt. no. 65 at 82—is not supported by the record. The responses regarding the death penalty of each of the prospective

white jurors that King identified cannot be characterized as hesitant. In stark contrast, the responses of McCall about the death penalty can only be characterized as hesitant and that hesitation was grounded in her religious beliefs. Thus, King has not shown that the white venire members were treated differently from McCall in a manner that suggests or evidences discriminatory intent.

The issue, then, is whether the overarching relevant circumstances, discussed supra Part IV.G.1., in combination with the prosecutor's incorrect reason for striking McCall and incorrect representation of the record are sufficiently clear and convincing to rebut the state court's finding that the prosecution was not motivated in substantial part by discriminatory intent in striking McCall. Although the question is closer than some, King has not met his burden with respect to McCall—especially when considering her strong hesitation in recommending the death penalty and her hesitation in her belief that she could even recommend that penalty.[19] See Dkt. No. 17-1 at 46 (replying that she "think[s]" she "could" recommend the death penalty if it was

---

[19] Contrary to King's argument, the fact that McCall only "thought" she could impose the death penalty was argued by the prosecutor as a race-neutral reason for striking McCall and thus is properly considered by the Court. The prosecutor argued to the trial court that he struck McCall in part because "[s]he had a lot of hesitancy about her" regarding the death penalty. Dkt. No. 16-28 at 24. Saying she only "thought" she could recommend the death penalty (especially when compared to her answers regarding recommending the life imprisonment options) is aptly characterized as "hesitancy."

AO 72A
(Rev. 8/82)

the most appropriate penalty but replying that she "could" recommend life imprisonment and life imprisonment without the possibility of parole). Thus, the Court cannot say that the Georgia Supreme Court's finding—that the trial court did not abuse its discretion in finding that the strike of McCall was proper—was unreasonable.

### 3. Lillie Burkett

The prosecutor set forth two race-neutral reasons for this strike. The first reason was that she was a minister; the prosecutor explained he "do[es] not take people on juries who are ministers" because "[t]hey have a particular point of view about trying to forgive people and look to the best in them." Dkt. No. 16-28 at 27. Second, "she knew [King's] family in this case, and the fact that the family situation, the background situation, will be an issue in the psychological testimony that will come, made [him] feel that she would not be a fair juror in that respect." Id.

King has not shown that the Georgia Supreme Court's decision—that the trial court did not abuse its discretion in finding that the prosecution's strike of Burkett was not motivated in substantial part by discriminatory intent—was unreasonable. First, the prosecution's primary reason for striking Burkett was that she was a minister, and he does "not take people on juries

who are ministers." Id. While the prosecution's questioning of Burkett on this topic may not have been particularly probing, he did learn from her that she had been a minister for eight years—a substantial period of time. Tellingly, the prosecution's questioning of others regarding their role in the church was equally as limited to that person's title/role and did not probe into the specifics of the role. See, e.g., Dkt. No. 16-13 at 94-95 (questioning Samantha Drew); Dkt. No. 16-14 at 5-6 (questioning Connie Arnold); Dkt. No. 16-15 at 137-38 (questioning Jacqueline Alderman); Dkt. No. 16-16 at 97-98 (questioning Alnorris Butler); id. at 140-41 (questioning James Orvin); Dkt. No. 16-17 at 16-18 (questioning Tamela Folsom); id. at 79-80 (questioning Rebecca Griffin); Dkt. No. 16-23 at 56-57 (questioning Eddie Vann); Dkt. No. 16-24 at 37 (questioning Brandy DeLoach); Dkt. No. 16-25 at 17-18 (questioning Carzell Rooks). Further, Johnson, the main prosecutor, showed that he was familiar with, at least, the Baptist Church. When he asked Rebecca Griffin about her position in the church, she replied that she taught "Training Union," dkt. no. 16-17 at 80. Johnson replied that "[h]earing the special words, you must be Baptist," and that he was "raised Baptist so I can understand." Id. King's argument that the prosecution treated Burkett differently than similarly situated whites with regard to their positions in the church is not supported by the record because he questioned all jurors similarly on the matter and no

AO 72A
(Rev. 8/82)

other jurors were ministers with the exception of Thomas Lightsey.[20]

Turning to King's second argument, the prosecution's lack of questioning regarding Burkett's relationship to the King family does not move the needle either. The prosecution's reason that he does not take ministers is a valid race-neutral reason for striking Burkett. It is unsurprising, then, that the prosecutor did not probe further into the extent of Burkett and the King family's relationship because the prosecution already had reason enough to strike Burkett. Thus, the Georgia Supreme Court's finding that the trial court did not abuse its discretion with respect to the defense's challenge of Burkett was not unreasonable.

### 4. Gwen Gillis

The prosecutor's proffered reasons for striking Gillis were that she lived near King's aunt, that she was a neighbor of the family of King's co-defendant, and that she lived close to "one of the relatives, Gary Andrews," in whose house the murder weapon was found. Dkt. No. 16-28 at 27. King first argues that the prosecutor's reasons were pretextual because the prosecutor learned by his questioning only that Gillis lived down the road

---

[20] Although the prosecution did not strike Thomas Lightsey, who was also a minister, the prosecution was never given that opportunity. The prosecution indeed could have saved one of its strikes for Lightsey. But the prosecution's choice not to makes sense considering that Lightsey was the second to last prospective juror that could have been selected for the petit jury.

AO 72A
(Rev. 8/82)

from King's aunt. It was not until the defense's individual voir dire of Gillis that Gillis stated she was a neighbor of King's co-defendant and of Gary Andrews. The prosecutor, however, learned from the fact that Gillis lived near King's aunt that, as he informed the trial court, "she would have lived in the neighborhood where both of the co-defendants' family lived." Id. at 27-28. For this reason, the prosecution "was not willing to accept her as a juror." Id. at 28. Thus, the prosecutor did not need to question her further because he had learned the information necessary in his mind to strike her. Second, King again points to white venire members Connie Arnold, Karen Milton, Rebecca Griffin, Martha Vaugn, and James Edwards as having connections to witnesses that were just as strong. These jurors' connections, however, were far too attenuated to be compared to a neighbor of both co-defendants and Andrews.[21] Thus, King has not met his burden with respect to Gillis.

---

[21] Arnold ran a video store where King would rent videos. She worked there for about a year in 1990. Dkt. No. 16-14 at 1, 5-6. Milton, an x-ray technician, had only one connection in that she once gave King a CT scan. Dkt. No. 16-15 at 80-87. Griffin went to school with Juanita King (and her brother went to school with King, but she did not think she ever met King). Dkt. No. 16-17 at 80. Griffin did not state how well she knew Juanita, just that they were classmates at one point in time. Vaughn worked in a cafeteria, and her only contact with King was "[t]hrough the lunch period for just a brief period of time." Dkt. No. 17-1 at 20-21. Edwards was a middle school teacher, who may or may not have taught King as one of the seven hundred students he teaches a year for a class that meets for only six-weeks. Dkt. No. 16-20 at 7-8. Based on this record, these relationships are tenuous, at best.

### 5. Jane Ford

Jane Ford was a white female who was struck by the prosecution. King challenged her strike as being improperly motivated by discrimination based on Ford's gender. The trial court denied this challenge. The prosecution put forth two gender-neutral reasons to the trial court. First, "she was a single mother, had no family here, had children and no one to care for those children." Dkt. No. 16-28 at 25. Second, and the "primary reason" was because of her "relationship with [intellectually disabled] kids at school." Id. She was a special education teacher, and the only person that indicated that she enjoyed the relationship with intellectually disabled persons. Id.

King argues that the Georgia Supreme Court's finding that the trial court did not abuse its discretion in finding that the strike was proper was unreasonable for three reasons: (1) the Georgia Supreme Court "unreasonably ignored both the inconsequential nature of [Ford's] testimony about her work with intellectually disabled students (a one-word affirmative response to defense counsel's question about whether she enjoyed her job)," dkt. no. 65 at 101, and (2) "the host of prospective jurors who were acceptable to the prosecution despite closer ties to individuals with intellectual disability," id.; and (3) the Court inaccurately characterized one of the prosecution's justifications when it

stated that Ford was stricken "because she was a single mother who would be financially burdened by jury service," id. (quoting King, 539 S.E.2d at 796).

Even though the Georgia Supreme Court mischaracterized one of the prosecution's justifications, it was not unreasonable for the Georgia Supreme Court to find that the trial court did not abuse its discretion when it credited the prosecution's "primary reason" for striking Ford. It is axiomatic that "determinations of credibility and demeanor lie peculiarly within a trial judge's province." Flowers, 139 S. Ct. at 2244 (quoting Snyder, 552 U.S. at 477). Thus, it was not unreasonable for the Supreme Court of Georgia to find that the trial court did not abuse its discretion in determining that the prosecution's "primary reason" for striking Ford was gender-neutral and sincere—and thus that the strike was not motivated in substantial part by discriminatory intent. Finally, with the exception of Dennis Reynolds, King's argument that Ford was treated differently than the other females because she was female is illogical.[22]

### 6. Barbara Dean

The final challenged strike properly before the Court was against Barbara Dean, who was also a white female. The

---

[22] King argues that because Ford was female she was treated differently than other females who also interacted with intellectually disabled people.

AO 72A
(Rev. 8/82)

prosecution's proffered gender-neutral justification was that "her stepson [who was a possible state witness] was shot by Darren Crosby, who is a potential witness in this case and who is the brother of Karen Crosby." Dkt. No. 16-28 at 20. King argues that the prosecutor's discriminatory intent was obvious because he did not ask Dean "a single question about her relationship to these two state witnesses or her knowledge of the alleged attack, even after defense counsel had questioned her about her familiarity with state witnesses." Dkt. No. 65 at 105. Further, when the defense argued that Dean was unconstitutionally struck because she was female, the prosecutor laughed, which shows he was acting with discriminatory intent. See Dkt. No. 16-28 at 29-30.

Again, King cannot meet his burden under AEDPA. Although the prosecutor did not ask Dean any questions, the prosecution already knew that her stepson, a possible state witness, was shot by Darren Crosby, another possible state witness and *brother of the victim*. See Dkt. No. 16-28 at 43 ("I happen to know that Barbara Dean's stepson was shot by Darren Crosby. I don't have to ask them and embarrass them about that information. I don't have to go into it. If I know it and can reasonably verify it's accurate, I've got a right to rely on that no matter what, just like defense counsel does."). Even though the prosecution did not ask Dean questions regarding this relationship, it was not unreasonable for the Georgia Supreme Court to find that the trial court did not

AO 72A
(Rev. 8/82)

abuse its discretion in finding that the prosecution's justification was both gender-neutral and credible.

## V. Certificate of Appealability

Federal Rule of Appellate Procedure 22(b)(1) provides in relevant part: "In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court . . . the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a [COA] under 28 U.S.C. § 2253(c)." Under 28 U.S.C. § 2253(c)(2), a COA should be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." The United States Supreme Court has recently reemphasized that "[t]he COA inquiry . . . is not coextensive with a merits analysis." Buck v. Davis, 137 S. Ct. 759, 773 (2017). Rather, at this stage, "the only question is whether the applicant has shown that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Id. (internal quotation marks and citation omitted).

Here, King has made a substantial showing of the denial of a constitutional right with respect to his Batson claims and the issues pertaining thereto. The Court finds that "jurists could conclude the issues presented are adequate to deserve

106

encouragement to proceed further." <u>Id.</u> (internal quotation marks and citation omitted). Accordingly, King is **GRANTED** a Certificate of Appealability as to (1) whether he is entitled to *de novo* review of these claims under 28 U.S.C. 2254(d)(1) because the Georgia Supreme Court unreasonably applied <u>Batson</u>; and (2) whether the Georgia Supreme Court's decisions that the trial court did not abuse its discretion in finding that <u>Batson</u> was not violated with respect to Burkett, Vann, McCall, Dean, Ford, and Gillis were unreasonable.

As to King's remaining claims, the Court **DENIES** a Certificate of Appealability finding that no jurist of reason could disagree with the Court's conclusions on the issues presented in these claims.

## CONCLUSION

For the reasons provided above, King has failed to establish that he is entitled to relief under 28 U.S.C. § 2254. Accordingly, his petition for a writ of habeas corpus is **DENIED**.

King is, however, **GRANTED** a Certificate of Appealability on the issues of (1) whether he is entitled to *de novo* review of these claims under 28 U.S.C. § 2254(d)(1) because the Georgia Supreme Court unreasonably applied <u>Batson</u>; and (2) whether the Georgia Supreme Court's decisions that the trial court did not abuse its

AO 72A
(Rev. 8/82)

discretion in finding that <u>Batson</u> was not violated with respect to Burkett, Vann, McCall, Dean, Ford, and Gillis were unreasonable.

**SO ORDERED**, this 24th day of January, 2020.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA

AO 72A
(Rev. 8/82)